[Crim. No. 5632.   Oct. 7, 1954.]

In re CARYL CHESSMAN on Habeas Corpus.

Berwyn A. Rice, Jerome A. Duffy and J. W. Ehrlich for Petitioner.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

CARTER, J.—On July 16th, 1954, Caryl Chessman filed in the Supreme Court of the State of California a petition for a writ of habeas corpus* in which he alleged that he was

---

*"II

"That said imprisonment, detention, confinement [sic] and restraint are illegal, and that the illegality thereof consists of this, to-wit:   That said CARYL CHESSMAN was deprived of his rights and due process of law in that a certain case entitled PEOPLE OF THE STATE OF CALIFORNIA VS. CARYL CHESSMAN, Defendant, No. 117963A, of the Superior Court of the State of California in and for the County of Los Angeles, by reason of the fraudulent conduct of the Deputy District Attorney of Los Angeles County, MR. MILLER LEAVY, who prosecuted said case, in the preparation of the Transcript On Appeal, and the misrepresentations knowingly made by said LEAVY to the Trial Judge of the Superior Court of the State of California in and for the County of Los Angeles, for the purpose of inducing said Court to certify to, settle, allow and approve the said

unlawfully imprisoned, detained and restrained of his liberty at the California State Prison at San Quentin, California, and that such imprisonment, detention and restraint were illegal because they were occasioned by a deprivation of peti-

Transcript and transmit the same to the Supreme Court of California as a true and correct record on appeal, in this: That one, E. R. PERRY, was the Official Court Reporter, who took down in phonographic writing all of the proceedings had throughout the trial above mentioned; that subsequent thereto and in the month of June, 1948, said Official Reporter died before he had an opportunity to transcribe his notes; that throughout said trial, said Official Reporter was in ill health and unable to properly record the proceedings and testimony; that said deceased reporter, E. R. PERRY, used the Pitmanic method of recording mixed with his own personal system; that thereafter the notes of said E. R. PERRY, taken during the trial, were presented for examination to numerous Official Court Reporters of Los Angeles County, by said MILLER LEAVY, requesting that they transcribe the same; that said Official Court Reporters informed MR. LEAVY that they were unable to do so because of the use by MR. PERRY of his personal system and the poor penmanship of MR. PERRY, and that said notes were to a great extent undecipherable; that thereafter in September, 1948, the Board of Supervisors of Los Angeles County entered into a contract with one, STANLEY FRASER, for the purpose of transcribing said notes of the deceased reporter, MR. PERRY; that MR. MILLER LEAVY actively participated in the negotiation of the contract with MR. FRASER over the protests of the Chairman of the Executive Committee of the Los Angeles Superior Court Reporters Association.

"III

"*That said* STANLEY FRASER *is a close relative of said* MILLER LEAVY; *that said* STANLEY FRASER *was a discredited Court Reporter from the State of Wahsington* [sic]; *that said* STANLEY FRASER *was and is addicted to the excessive use of alcohol*; that pursuant to said contract, said STANLEY FRASER attempted to decipher and transcribe the notes of MR. PERRY, the deceased reporter; that he was unable to do so with any degree of accuracy whatsoever; that as the result of the inability of said STANLEY FRASER to read said notes, *said* STANLEY FRASER *conferred for many days with said* MILLER LEAVY *both at the home of said* MILLER LEAVY *and his office; that said* MILLER LEAVY *directed and controlled said* STANLEY FRASER *in the preparation of the transcript and throughout the preparation of all 1200 pages of reported transcript dictated to said* STANLEY FRASER *what he, the said* MILLER LEAVY, *believed to have been the testimony and instruction of the Court in the proceedings*; that said transcript did not truly and correctly represent the transcription of the notes of the deceased reporter, which fact was well known to MILLER LEAVY; that during the conferences held between said LEAVY and FRASER as aforesaid, said LEAVY edited, revised and deleted said transcription then being made by MR. FRASER to the detriment of said CARYL CHESSMAN in many material respects; *that throughout the attempted transcription of said notes, said* STANLEY FRASER *was in an inebriated condition and was required to rely extensively on the dictation of his relative,* MR. LEAVY; *that said transcription does not reflect the true and correct transcription of* MR. PERRY'S *notes, but reflects in great part the recollection of* MR. LEAVY *as to what occured* [sic] *during the progress of the trial; that among other alterations of said transcript, the remarks of the Court to the jury on May 21, 1948, at a time when the jury had returned to the court for further instructions, were edited, revised and deleted by said* LEAVY *to the extent that the Court's remarks, as reflected on Page 1792 of the Transcript On Appeal on Line 23 thereof consist*

tioner's right to due process of law in an action entitled *People* v. *Chessman* in the Superior Court of Los Angeles County by reason of the fraudulent conduct of the deputy district attorney of Los Angeles County who prosecuted said

*of less than five lines, whereas said Court instructed the jury on the point therein raised for fifteen or twenty minutes, the report of which should consume many pages of transcript; that the Trial Court committed grievous error in instructing the jury that in the event the jury found defendant,* CARYL CHESSMAN, *guilty of the crime of kidnapping as set forth in the information, then, unless a death sentence were imposed, Defendant might be free under the practices of the California Adult Authority in a few years; that the Trial Court instructed the jury that if the jury found Defendant guilty then it was their duty to bring in a death sentence; that said instructions do not appear in the record submitted to the Supreme Court On Appeal; that the Trial Court further advised and instructed the jurors that in the event they found the Defendant guilty of the kidnapping charges involved that a verdict of death was mandatory; that the Transcript On Appeal does not reflect such instructions to the jury made by the Trial Court;* that said MILLER LEAVY, Prosecuting Attorney, was well aware of the instructions of the Court at the time that he represented to said Court that the Transcript On Appeal was a true and correct transcript of the proceedings had and instructions given by the Court; that at the time as shown by the Transcript On Appeal herein said MILLER LEAVY represented to the Court that said transcript represented a true and correct transcription to the best of his ability of the notes of said deceased reporter, E. R. PERRY, said MILLER LEAVY knew that said transcript did not contain a true and correct report of the instructions of the Trial Court upon the trial of said action; that STANLEY FRASER, Court Reporter, well knew at the time of certification of the transcript On Appeal presented to this Court, that the same was not a true and accurate transcription of the notes of the deceased reporter, E. R. PERRY; *that said* MILLER LEAVY *knew at the time of hearing of the motion for settling and approval of the Transcript On Appeal herein that the Trial Court had given such instructions; that the same do not appear and have not been presented to this Court in the Transcript On Appeal;* that the said MILLER LEAVY represented to the Trial Court on said hearing that the transcript presented was a true and correct transcript of the proceedings had upon instructions to the jury; that said MILLER LEAVY, Prosecuting Attorney herein, knowing said transcript to be incorrect represented to the Trial Court that said transcript represented and was a true and correct transcription of the shorthand notes of E. R. PERRY, knowing that the same was not a true and correct transcription of the proceedings had upon the trial of said action and the instructions of the Court given at said trial; that in reliance upon the representations of said MILLER LEAVY, said Trial Court settled, allowed and approved said transcript on appeal.

"IV

"That on April 11, 1949, in the Superior Court of the State of California in and for the County of Los Angeles, MILLER LEAVY, Deputy District Attorney in and for the said County of Los Angeles, appeared before the Trial Court and offered and presented the transcript of the notes of the said deceased reporter, E. R. PERRY, as transcribed by STANLEY FRASER for settlement and approval; that Defendant was not present upon said hearing; that at said time and place, MILLER LEAVY, said Prosecuting Attorney, represented to the Court that said transcript as offered and as subsequently submitted to this Honorable Court on appeal was an accurate record and transcript made to the best of his

action in the manner in which the purported record on appeal in said action was prepared.

Said petition for writ of habeas corpus was denied by the Supreme Court of California on July 21st, 1954, without a written opinion.

On July 27th, 1954, there was presented to me an application for a stay of execution in which it was alleged that defendant was about to apply and will apply to the Supreme Court of the United States for a writ of certiorari directed to the Supreme Court of California to review the action of said last-named court in denying said petition for writ of habeas corpus. Said application for stay of execution was

ability by said STANLEY FRASER from the shorthand notes of said E. R. PERRY; that said MILLER LEAVY represented to the Trial Court that said STANLEY FRASER had deciphered said notes and that the actual transcription thereof as presented to the Trial Court and subsequently presented to this Court on appeal as a true and correct transcription of the notes of the deceased reporter, E. R. PERRY, transcribed by said STANLEY FRASER to the best of his ability and that the same was a true and correct and accurate transcription of the notes of said E. R. PERRY; that at said time said MILLER LEAVY well knew that said transcription as presented for settlement and approval was not a true and accurate transcription of the notes of the said E. R. PERRY, and that the same had not been transcribed from the notes of said E. R. PERRY; that MILLER LEAVY knew at the time of said hearing on settlement and approval of said transcript that said transcript did not contain the true and accurate transcription of the instructions of the Court to the jury upon the hearing of said action; that in truth and in fact the Trial Court instructed the jury upon the request of said jury for further instructions, that in the event said jury found Defendant guilty of the crime of kidnapping as alleged, said jury must return the death sentence; that the Trial Court instructed the jury upon the petition of the jury for further instructions, that 'This Defendant is one of the worst criminals I have had in my Court.' ''

''VI

''That the facts herein alleged were known to Petitioner who was present at the trial of said action in the Superior Court, but that proof of the same were not substantiated by Petitioner until June 25, 1954, or thereabouts, at which time Petitioner, through his agents was able to contact and communicate with the jurors who heard and determined his case; that such delay was occasioned by the fact that Petitioner heretofore appeared in propria persona and being confined to the California State Prison at San Quentin, California, was not able to communicate with the jurors and other people present at the trial of his said case; *that Petitioner for the first time on May 4, 1954, was able to and did engage consel* [sic] *of his own choosing; that Petitioner's agents and employees have communicated with members of the jury of said action and other persons present during the trial of said action in the Superior Court for the first time in June of 1954; that Petitioner has diligently endeavored to obtain affidavits from the trial jurors, court attaches and people present during the trial, and more particularly during the giving of instructions by the Trial Court, but that said persons have refused to give affidavits; that said persons have evinced willingness to testify to the facts herein alleged under oath and pursuant to subpoena.*''

based in part upon the allegations contained in said petition for writ of habeas corpus which was denied by the Supreme Court of California on July 21st, 1954.

On July 28th, 1954, I signed an order granting a stay of execution pursuant to said application and the same was filed in the Supreme Court of California on July 29th, 1954, and is still in full force and effect.

On August 14th, 1954, a petition for writ of certiorari to the Supreme Court of California was filed in the Supreme Court of the United States by said Caryl Chessman and is still pending in said court. On August 19th, 1954, the attorney general of California filed in the Supreme Court of California "Notice of Motion to Vacate and Set Aside Order Staying Execution," which notice of motion was directed to "the Supreme Court of the State of California and the Honorable Jesse W. Carter, one of the Justices thereof," and prayed for an order vacating the order made by "said Honorable Jesse W. Carter, as a Justice of the above entitled court, on July 28, 1954, and filed in the office of the Clerk of said court on July 29, 1954, staying the execution of said Caryl Chessman."

Said notice of motion stated that motion would be made in said court on Monday, the 13th day of September, 1954, at the hour of 10 o'clock a. m. upon the following grounds:

"1. That the said order was beyond the jurisdiction of Honorable Jesse W. Carter, one of the Justices of this court.

"2. That the said order was made on an erroneous assumption of facts, i.e., (a) 'that the alleged fraudulent procurement of said transcript was not known to petitioner [Chessman] until June of this year [1954]' and (b) 'the facts in connection therewith were never presented to any court until the petition for a writ of habeas corpus was filed in the Supreme Court of California on July 16, 1954.'

"3. That the said order was obtained as a result of false representations made to said Honorable Jesse W. Carter.

"4. That the application for a stay was made solely for the purposes of delay.

"5. That the application for a writ of habeas corpus and the subsequent application for a stay were and are without merit."

The motion above mentioned was made on September 13th, 1954, before the Supreme Court of California sitting in bank in San Francisco and was directed both to the court in bank and to myself individually as a justice of said Supreme Court, and it is my purpose in preparing this opinion to dispose of

the portion of the motion directed to me individually as a justice of the Supreme Court of California.

In disposing of the first ground of said motion, I hold that the order granting said stay of execution was not beyond my jurisdiction as one of the justices of the Supreme Court of California. The power of a justice or judge of a court to order a stay of execution is set forth in a federal statute, which provides:

"In *any case* in which the final judgment . . . of *any* court is subject to review by the Supreme Court on writ of certiorari, the execution and enforcement of such judgment . . . may be stayed for a reasonable time to enable the party aggrieved to obtain a writ of certiorari from the Supreme Court. The stay may be granted by a *judge of the court rendering the judgment . . . or by a justice of the Supreme Court. . . .*" (Emphasis added; 28 U.S.C.A. § 2101(f).) It is conceded that that provision is here applicable and it will be noted that it empowers *a* judge of the court rendering the judgment (that may be *a* judge of a state court) or a justice of the Supreme Court. They are in the same category insofar as power is concerned and that power is derived from *federal* law. There is no requirement that the judge granting the stay participated in the judgment for which review is sought as it is any judge of the court rendering the judgment. The statute is obviously within the power of the federal government as it is nothing more than an incidental part of the effective exercise of the jurisdiction of the Supreme Court of the United States to review decisions of state courts, a method of preserving the status quo in order that the exercise of its jurisdiction will not be futile. It is like the inherent power of a court to grant supersedeas in aid of its appellate jurisdiction. Care is taken in the statute to point out that the stay need not be granted by the *court* as such. It may be granted by *a* judge of the state or federal court. When a state court judge acts thereunder he is necessarily acting as an arm or agent of the United States Supreme Court rather than in his capacity as a state court judge. I say he is necessarily acting in that capacity because his power is derived from the federal law and if his capacity were not such then the federal statute would be invalid. It is in aid of the jurisdiction of the United States Supreme Court to review state court judgments. Acting as he does under the federal law for the United States Supreme Court, the situation is no different than when *a* justice of the United States Supreme Court grants a stay. Therefore, the

fundamental principles stated in *Rosenberg* v. *United States,* 346 U.S. 273 [73 S.Ct. 1152, 97 L.Ed. 1607], are applicable. There one of the justices of the United States Supreme Court (Mr. Justice Douglas) granted a stay after the majority of that court as such had refused it. The court set the stay aside deciding the question which caused Mr. Justice Douglas to grant the stay, stating at page 1159: "Mr. Justice Douglas *had power to issue the stay.* No one has disputed this, and we think the proposition is indisputable.

"Stays are part of the 'traditional equipment for the administration of justice.' *Scripps-Howard Radio, Inc.* v. *Federal Communications Commission,* 1942, 316 U.S. 4, 9-10, 62 S.Ct. 875, 880, 86 L.Ed. 1229. The individual Justices of this Court have regularly issued them, *and the exercise of that power is vital to the proper functioning of our jurisdiction.* . . .

"Thus Mr. Justice DOUGLAS, *in issuing the stay,* did not act to grant some form of amnesty or last-minute reprieve to the defendants; he simply acted *to protect jurisdiction over the case, to maintain the status quo until a conclusive answer could be given to the question which had been urged in the defendants' behalf.* . . .

"Ordinarily the stays of individual Justices should stand until the grounds upon which they have issued can be reviewed through regular appellate processes." (Emphasis added.)

It is clear from the foregoing that a justice or judge of a court in granting a stay is acting the same as a justice of the Supreme Court of the United States. He is protecting *that* court's jurisdiction. The stay may be set aside, therefore, only by the United States Supreme Court, not by the state court. Suppose the final decision had been made by our District Court of Appeal and one of that court's justices granted a stay. Could it be urged successfully that this court could set aside the stay? Certainly not, because the justice's action would not be subject to this court's supervision as he acted not as a justice of a state court but as an arm of the United States Supreme Court.

Also implicit in the Rosenberg case is the proposition that where a stay has been granted by a justice, the court as a whole will not vacate it unless it passes on the basis for its granting. That was done in the Rosenberg case. Here that question cannot be determined by this court because it is not before it. It is before the United States Supreme Court. Inasmuch as the federal law empowers a justice of this court to grant a stay, he has the power to ascertain whether there

is a probable federal question which the United States Supreme Court will decide. This court has no power to interfere with that determination any more than another justice of this court has.

For the foregoing reasons the state's argument that generally the court may set aside the adjudication of one of its justices and that there is no merit to Chessman's claims, are beside the point. The power exercised is derived from federal, not state, law, and must be determined thereby.

In disposing of the second ground of said motion I hold that said order was not made on an erroneous assumption of facts. While it is true that Chessman contended in the various proceedings instituted by him after the death of court reporter E. R. Perry, who reported the proceedings at his trial in the Superior Court of Los Angeles County, that the transcript purportedly prepared by Stanley Fraser and Miller Leavy from Perry's notes, was inaccurate and incomplete and that Leavy and Fraser fraudulently connived in the preparation of said transcript and fraudulently represented to the trial judge that the same was a true and correct transcript of the proceedings at Chessman's trial, it is also true that at no time and in no proceeding prior to the filing of the petition for writ of habeas corpus in the Supreme Court of California on July 16th, 1954, were any of the following facts presented to the Supreme Court of California:

(1) That Stanley Fraser is a close relative of Miller Leavy; that Fraser was a discredited court reporter from the State of Washington and was addicted to the excessive use of alcohol; that he was in a state of inebriety during the time that he was engaged in transcribing the notes of court reporter Perry in the Chessman case and was unable to correctly read and transcribe said notes; that he was under the domination and control of Miller Leavy, deputy district attorney who had prosecuted Chessman and that Miller Leavy directed and controlled Fraser in the preparation of the transcript and dictated to Fraser what Leavy believed to have been the testimony of the witnesses and the instructions of the court in the Chessman case and that the transcript as prepared by Fraser and Leavy did not reflect the true and correct record as disclosed by the shorthand notes of reporter Perry.

(2) That the transcript as prepared by Leavy and Fraser failed to state the remarks of the court to the jury on July 21st, 1948, at a time when the jury had returned to the court for further instructions, when it is claimed by Chessman

that the court verbally instructed the jury that in the event it found Chessman guilty of kidnapping as set forth in the information, it should impose the death penalty.

(3) That in May, 1954, Chessman was first able to employ counsel of his own choosing, and the counsel then employed by him made an investigation which Chessman had theretofore been unable to make and ascertained the above mentioned facts by conferring with court attaches and jurors and others familiar with the conduct of Fraser and Leavy.

In disposing of the third ground of said motion I hold that said order was not obtained as a result of false representations made on behalf of Chessman to me.

The contention of the attorney general that false representations were made to me on behalf of Chessman and that I was thereby induced to grant said stay of execution was apparently based upon the assertion of the attorney general that Chessman was aware of the conduct of Leavy and Fraser in the preparation of the transcript on appeal; that since 1949 he had known all of the facts and matters presented in his petition for writ of habeas corpus filed in the Supreme Court of California on July 16th, 1954; that said facts and matters had been theretofore presented to said court; and that his assertions to the contrary constituted the false representations upon which the attorney general relies.

It is true that in paragraph VII of Chessman's petition for writ of habeas corpus it is alleged "That the facts herein alleged were known to Petitioner who was present at the trial of said action in the Superior Court, but that proof of the same were not substantiated by Petitioner until June 25, 1954, or thereabouts, at which time Petitioner, through his agents was able to contact and communicate with the jurors who heard and determined his case." It is perfectly obvious, however, that the foregoing allegation has no application to any of the facts alleged by Chessman with respect to the preparation of the record on appeal from the judgments of conviction against him in the Superior Court of Los Angeles County as all of the proceedings with respect to the preparation of said record took place after the trial and in the absence of Chessman who was then confined in Death Row at San Quentin and had no counsel representing him.

It should also be noted that although the italicized statements contained in Chessman's petition for a writ of habeas corpus which was filed in this court on July 16th, 1954 (see footnote hereinabove), make grave charges against

both Leavy and Fraser, no denial thereof has ever been made by either of them. While they may not have had an opportunity to deny these allegations before the stay of execution was granted, they certainly had an opportunity to file affidavits in support of the motion of the People to vacate the stay of execution. This they did not see fit to do. Had such denials been made I would be disposed to grant the motion here presented.

At the oral argument of the motion to vacate the stay of execution Mr. Clarence Linn offered in evidence photostatic copies of a number of documents which are certified to be a full, true and correct copy of the original on file in the office of the county clerk of Los Angeles County. Among these documents is a copy of a letter which purports to have been written to Chessman by Emily Matthews. While the letter is undated the following figures appear at its head, "7-29," which would indicate that the letter was written July 29th but without designation as to year. This letter contains the statements "The record is in bad shape. They have the third man on it now, and Al is quite elated as he is M. L.'s wife's cousin."

None of the documents, including said letter, which Mr. Linn offered in evidence at the oral argument of this motion are a part of any of the records on appeal to this court and were never before presented to this court. When Mr. Linn offered the letter in evidence I asked him if it was a part of the record before this court and he stated that it was. This statement is absolutely untrue. While I do not accuse Mr. Linn of making a deliberately false statement for the purpose of misleading the court, it cannot be denied that his statement in his oral argument that "Now, that [letter] was before the superior court and came up here with the entire record" is untrue. In any event the first time the letter in question was ever called to the attention of this court was in connection with the motion of the People to vacate the stay of execution, and I never heard of the letter before then. It should also be noted that the letter does not mention either Miller Leavy or Fraser. So far as the record in this case is concerned it appears that Chessman discovered the facts with respect to the relationship of Leavy and Fraser and the unreliability and incompetency of Fraser to transcribe the record after he employed an attorney in May, 1954, and that these facts were first presented to this court in his petition for a writ of habeas corpus on July 16th, 1954. Attached to

said petition was an affidavit by his attorney Berwyn A. Rice setting forth facts relative to his investigation.

The specific factual matter concerns the fact that the reporter's transcript fails to accurately or completely embrace that portion of the instructions of the trial judge given to the jury, at their request, during the course of their deliberations.

The jury requested further instructions from the trial judge as to the legal meaning and effect of the jury's recommendation of a sentence of life imprisonment without the possibility of parole. It appears that there are facts which can be presented to establish the proposition that the trial judge "instructed the jury to impose the death penalty" upon the defendant Chessman, and further instructed the jury that "life imprisonment without the benefit of parole" was, in a practical sense, meaningless.

The foregoing facts were never presented to this court until the petition for habeas corpus was filed on July 16th, 1954. The fact that the juror consulted by Rice later denied she made certain statements to him should have no bearing upon the question of whether or not a stay of execution should have been granted on July 28th, 1954. It seems rather odd that the People should file an affidavit of the juror denying what she had purported to state to Rice and at the same time the charges against Leavy and Fraser contained in the petition should stand undenied. In addition to the facts alleged in Chessman's petition for habeas corpus hereinabove set forth which were not presented to this court prior to the filing of said petition, there were also presented to me verbally at the time the application for a stay was presented many facts involving improper conduct of Fraser and Leavy relative to the preparation of the record on appeal in the Chessman case, but since these alleged facts were not submitted in the form of an affidavit and made a part of the record in this case, I have refrained from setting them forth in this opinion. They would, however, be germane to any further inquiry which might be made into the conduct of these parties in this case. Of course none of these facts were ever presented to this court and have never been mentioned in any of the proceedings in the Chessman case because they were unknown to Chessman. They were discovered as the result of investigations made by Chessman's attorney, Berwyn Rice, who was not employed until May, 1954, and whose investigations in connection therewith were not completed until

after the filing of Chessman's petition for a writ of habeas corpus on July 16th, 1954.

As to grounds 4 and 5 of the motion to vacate and set aside the order staying execution, the attorney general has made no showing in support thereof, and they appear to be without merit.

The majority of this court has filed an opinion and order on motion to vacate stay of execution in this case which purports to deny said motion so far as the majority of the court is concerned. Since said opinion appears to be nothing more than a brief in opposition to the petition for writ of certiorari filed by Chessman in the Supreme Court of the United States and does not purport to decide any issue presented on the motion to vacate and set aside the order made by me staying execution, and since it is my opinion that it is not the function of this court to file a brief in the Supreme Court of the United States in opposition to a petition for a writ of certiorari and that the majority of this court has no function to perform in connection with an order staying execution such as the one involved here, I decline to participate in such opinion.

The motion to vacate and set aside the order staying execution in this matter is denied.