44 Cal.2d 1 (1955)
279 P.2d 24
In re CARYL CHESSMAN, on Habeas Corpus.
THE PEOPLE, Petitioner,
v.
SUPERIOR COURT OF MARIN COUNTY, Respondent; CARYL CHESSMAN, Real Party in Interest.
Docket No. Crim. 5591. S.F. No. 19158.
Supreme Court of California. In Bank.
February 1, 1955.
*3 Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Charles E. McClung, Deputy Attorney General, for Appellant in Crim. No. 5591, and for Petitioner in S.F. No. 19158.
Caryl Chessman, in pro. per., and Rosalie Asher for Respondent on appeal in Crim. No. 5591 and for Real Party in Interest in S.F. No. 19158.
No appearance for respondent in S.F. No. 19158.
SCHAUER, J.
By a petition for a writ of habeas corpus filed on October 17, 1951, Caryl Chessman, an inmate of San Quentin State Prison whose appeal from 17 judgments of conviction was pending, sought relief from allegedly illegal conditions of imprisonment which assertedly interfered with his representation of himself.[1] On December 18, 1951, this court affirmed the judgments, two of which imposed the death penalty. (People v. Chessman, 38 Cal.2d 166 [238 P.2d 1001].) The subject matter of Chessman's petition for habeas corpus has no relevancy whatsoever to the proceedings at the trial which resulted in his conviction or to the legality of the judgments which were imposed and affirmed and under which he is now confined and awaiting execution; it relates solely *4 to a matter of prison administration. After the judgments had been affirmed the superior court, in the habeas corpus proceeding, ordered that Chessman "continue to be allowed the free exercise" of asserted rights in connection with his representation of himself. The attorney general filed with the District Court of Appeal a notice of appeal from the superior court order; also, uncertain whether the People could appeal from the order, the attorney general filed with the District Court of Appeal a petition for a writ of review. The District Court of Appeal issued the writ of review. The matters have been transferred to this court, and Chessman has filed notices of motion to dismiss the review proceeding and the appeal. We have concluded, for reasons hereinafter stated, that the order appealed from should be reversed with directions to the superior court to dismiss the habeas corpus proceeding, and that the review proceeding should be dismissed.

Appealability of the Habeas Corpus Order
The principal ground of Chessman's motion to dismiss the appeal is that the superior court order is not appealable. The People have asked that this court pass on the question whether they can appeal from an order on habeas corpus which directs that a petitioner be granted relief but which does not order his release from custody.
In accord with the view that "The right of appeal is derived from our constitution or statutes" (Gale v. Tuolumne County Water Co. (1914), 169 Cal. 46, 52 [145 P. 532]), prior to the enactment of section 1506 of the Penal Code in 1927 it was held that no orders on habeas corpus were appealable. (Matter of Perkins (1852), 2 Cal. 424, 430; People v. Schuster (1871), 40 Cal. 627; Matter of Hughes (1911), 159 Cal. 360, 363 [113 P. 684]; Matter of Zany (1913), 164 Cal. 724, 727 [130 P. 710]; France v. Superior Court (1927), 201 Cal. 122, 127 [255 P. 815, 52 A.L.R. 869]; Ex parte White (1906), 2 Cal. App. 726, 727 [84 P. 242].) Section 1506 of the Penal Code, as enacted in 1927, provided insofar as is here material that "An appeal may be taken ... by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant after his conviction, in all criminal cases prosecuted by indictment or information in a court of record...." There followed a series of cases which announced that the People could appeal only in those cases which came within the precise wording of the statute and refused to allow an appeal where the habeas corpus order *5 was not made after conviction in a criminal case prosecuted by indictment or information. (In re Alpine (1928), 203 Cal. 731, 745 [265 P. 947, 58 A.L.R. 1500]; In re Bruegger (1928), 204 Cal. 169, 170 [267 P. 101]; Thuesen v. Superior Court (1932), 215 Cal. 572, 576 [12 P.2d 8]; Loustalot v. Superior Court (1947), 30 Cal.2d 905, 913 [186 P.2d 673]; In re Merwin (1930), 108 Cal. App. 31, 32 [290 P. 1076]; In re Dutton (1931), 119 Cal. App. 447, 448 [6 P.2d 558].)
Although in the last cited cases the court would not allow an appeal by the People except where there was literal compliance with statutory requirements that there be "conviction" in a case prosecuted "by indictment or information," a liberal view as to the meaning of the word "discharging" in section 1506 was taken in In re Larabee (1933), 131 Cal. App. 261, 264 [21 P.2d 132]. There an inmate of San Quentin, confined pursuant to a judgment of conviction in Los Angeles County, sought habeas corpus in Marin County. By the superior court order in the habeas corpus proceeding petitioner was "remanded to the custody of the Sheriff of Los Angeles County." The People appealed. Petitioner moved to dismiss the appeal on the ground that the order was not, in the language of section 1506 of the Penal Code, one "discharging" him. In denying the motion to dismiss, the appellate court said that the effect of the order was to discharge the petitioner from the custody of the warden, and the fact that the superior court also ordered petitioner remanded to the custody of the sheriff "did not have the effect of depriving the state of its right of appeal, for the reason that in the face of a valid commitment the trial court was without power to make such order."
In 1951 section 1506 of the Penal Code was amended to provide that "An appeal may be taken ... by the people from a final order of a superior court made upon the return of a writ of habeas corpus discharging a defendant after his conviction in all criminal cases...." It is Chessman's position that the order here is not appealable because it is not one "discharging" him. The People argue that as the uses of habeas corpus have been extended by judicial decision to the granting to prisoners of rights short of effecting their release from illegal custody, there should be a concomitant extension of appealability to orders effecting these new uses of the writ. [1] The function of the writ of habeas corpus is solely to effect "discharge" from unlawful restraint, though the illegality in respect to which the discharge from restraint *6 is sought may not go to the fact of continued detention but may be simply as to the circumstances under which the prisoner is held, as, for example, where he questions the propriety of his detention as an habitual criminal (In re McVickers (1946), 29 Cal.2d 264 [176 P.2d 40]; In re Seeley (1946), 29 Cal.2d 294, 299 [176 P.2d 24]; In re Harincar (1946), 29 Cal.2d 403 [176 P.2d 58]; In re Wolfson (1947), 30 Cal.2d 20 [180 P.2d 326]; In re Pearson (1947), 30 Cal.2d 871 [186 P.2d 401]) or where he questions the construction of the judgment of conviction under which he is held (In re Bramble (1947), 31 Cal.2d 43, 46, 51 [187 P.2d 411]). "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." (Pen. Code, § 1473.) [2, 3] The scope of inquiry at the hearing on the writ includes consideration of "any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge" (Pen. Code, § 1484) and "If no legal cause is shown for such imprisonment or restraint, or for the continuation thereof, ... [the] court or judge must discharge such party from the custody or restraint under which he is held" (Pen. Code, § 1485), which means that the prisoner may be discharged from illegal conditions of restraint although not from all restraint. Since this is the function and scope of habeas corpus, we conclude that it is proper and desirable to interpret section 1506 of the Penal Code in its use of the word "discharging" as being fully as broad as the scope of the writ itself.

The People as Parties to the Appeal
[4] It is Chessman's position that the appeal should be dismissed because the People are not parties who can maintain such appeal. The People are not named as respondents in the petition for habeas corpus; the respondents there named are the warden, two assistant wardens, and the chief custody officer of San Quentin. However, authority for an appeal in the name of the People is found in section 1506 of the Penal Code which since its enactment has provided that an appeal may be taken "by the people" from certain orders on habeas corpus.

Availability of Certiorari to Review Superior Court Habeas Corpus Order
[5] In support of his motion to dismiss the writ of certiorari Chessman contends that such writ will not lie to *7 annul an order of the superior court on habeas corpus, no matter how erroneous it may be, if the superior court had "jurisdiction," citing Matter of Hughes (1911), supra, 159 Cal. 360, 363. (See also Rose v. Superior Court (1948), 86 Cal. App.2d 173, 176 [194 P.2d 568].) However, we need not at this time reexamine the rationale of the Hughes case, or otherwise consider the grounds of dismissal urged by Chessman, because it follows as a matter of law from our conclusion that the remedy of appeal is available, that the writ of certiorari will not lie (Code Civ. Proc., § 1068), and, having been inadvertently issued, it will be discharged and the proceeding will be dismissed (see Matter of Hughes (1911), supra, 159 Cal. 360, 366; Rose v. Superior Court (1948), supra, 86 Cal. App.2d 173, 178).

The Merits of the Superior Court Order
The original petition for habeas corpus dated October 3, 1951, alleges in pertinent part that Chessman has appeared and desires to continue to appear in his own behalf in his then pending appeal, and that he anticipates unjustifiable punishment, "depriving him of the use of books, typewriter, etc., on the pretext that he has violated a prison rule by helping another man prepare a legal document." A supplement to the petition, dated October 7, 1951, alleges that the warden refused to have the original petition mailed to the superior court for filing; he returned it to Chessman with a notation that "I note that you anticipate that you are to receive some sort of punishment. I do not believe that any of us can look into the future and determine what will happen. I also note that you do not tell the truth throughout the petition." A further supplement, dated October 10, 1951, alleges that Chessman "is now confined in a `hole' cell," denied the use of "clerical supplies or legal books," and "has only a few sheets of this paper and pen." The petition and the two supplements were filed on October 17, 1951.
The writ issued and pursuant to its command Chessman was produced before the superior court; respondent warden filed a return and moved that the matter be dismissed. Chessmen filed a traverse to the return in which he asked that the petition stand as partial traverse and averred that the prison authorities "continue to treat petitioner in such a way ... as to deprive petitioner of his legal right effectively to litigate his case through the courts."
Chessman, although under sentence of death, personally appeared at six hearings in the superior court between October *8 26, 1951, and March 7, 1952. The following facts were established: The delay in the filing of the original petition was due to the fact that the warden sent it to the attorney general with a request for advice as to whether he should mail it to the court for filing; the attorney general advised that the warden should permit its filing. On October 9, 1951, the prison disciplinary committee found that Chessman had violated a prison rule by aiding another inmate and punished him by a reprimand; also on October 9, 1951, Chessman created a loud disturbance and for this he was summarily punished by confinement in a "quiet cell," without typewriter, books, or his papers, from October 10 to 15, 1951. On October 16, 1951, the disciplinary committee found Chessman guilty of disorderly conduct and he was punished by confinement to his own cell for 10 days. On October 26, 1951, Chessman first appeared in the superior court in the habeas corpus matter, the facilities which had been given him in connection with his representation of himself had been restored to him, and he admitted that the question of the deprivation of such facilities "in the abstract ... is moot."
During the course of the hearings Chessman wrote to Mr. Garry, attorney of record for another prisoner, that he wished to see Mr. Garry; Mr. Garry called at the prison to talk with his client, then asked to see Chessman; an assistant warden informed Mr. Garry that he could not see Chessman because he was not attorney of record for him. Mr. Garry sat with Chessman at the counsel table as "legal advisor" during one of the hearings on the habeas corpus matter.
The superior court ordered that the warden's motion to dismiss be denied and that Chessman "be remanded to the custody of the Warden ... with directions that the said Petitioner continue to be allowed the free exercise of the following legal and constitutional rights:
"(1) That the said Petitioner be allowed immediate access by mail to the courts of this State and of the United States at all times;
"(2) That the said Petitioner be allowed to make all reasonably necessary legal research for, and to prepare and file with any such court, any document he deems necessary to the maintenance of protection of his civil rights or to the effective representation of himself on appeal from, or in collaterally attacking, any or all of those judgments of conviction under which the Respondent Warden derives his legal authority to hold the said Petitioner in custody.
*9 "(3) That the said Petitioner be allowed to retain his personal legal papers and books at all times during which he may reasonably make use of them for the purposes hereinabove set forth.
"(4) That while so representing himself on appeal or in collaterally attacking any or all of those said judgments of conviction, the said Petitioner should be allowed privately to consult with attorneys of his own choosing and to consult and communicate with other responsible persons, so long as the said Petitioner and those who confer with him at the prison or communicate with him upon legal matters comply with the Rules and Regulations of the Prison respecting such activities."
[6] The writ of habeas corpus has been allowed to one lawfully in custody as a means of enforcing rights to which, in his confinement, he is entitled. It has been held that a prisoner is entitled to, and habeas corpus is available to enforce, "the right to file in any court a petition or other document which purports to seek some remedy or relief relating to the offense for which he was imprisoned" (In re Robinson (1952), 112 Cal. App.2d 626, 629 [246 P.2d 982]; In re Malone (1952), 112 Cal. App.2d 631 [246 P.2d 984]; see Ex parte Hull (1941), 312 U.S. 546, 549 [61 S.Ct. 640, 85 L.Ed. 1034]) and petitioner's right, at reasonable times, to consult privately with his counsel in preparation for trial (In re Rider (1920), 50 Cal. App. 797, 799 [195 P. 965]; In re Snyder (1923), 62 Cal. App. 697, 699 [217 P. 777]; In re Qualls (1943), 58 Cal. App.2d 330, 331 [136 P.2d 341]).
[7] The present order cannot be upheld as one enforcing such rights, for at the time of the hearings and the making of the order Chessman was not being deprived of those rights. The petition for habeas corpus had been filed and the delay preceding its filing was no longer a ground for complaint. Aside from the fact that the warden temporarily took the erroneous position that he could refuse to permit the filing of the petition for habeas corpus, no violation of any right to which a prisoner is entitled was made to appear. The temporary separation of Chessman from his papers was shown to have been an incident of punishment for his violation of a reasonable prison rule against the creation of loud disturbances. The refusal to permit him to see Mr. Garry was shown to have been based on the reasonable ground that Mr. Garry was not his attorney. [8] It is manifest from the *10 entire record of this habeas corpus proceeding that Chessman is claiming not rights but special privileges. As the court which tried him and this court have previously had occasion to point out, Chessman's decision to represent himself did not entitle him to greater privileges than other prisoners. (See People v. Chessman (1951), supra, 38 Cal.2d 166, 173-174, 176.)
[9] When it developed at the hearings that Chessman was not then being deprived of rights to which he as a prisoner was entitled, the superior court should have granted the People's motion to dismiss. Instead it made an order which purports to declare that Chessman "continue to be allowed" privileges which are not enforceable rights of prisoners. [10] For example, it would be manifestly impossible to allow prisoners "immediate access by mail to the courts ... at all times." [11] As indicated above, prisoners have the right to prompt and timely access to the mails for the purpose of transmitting to the courts statements of facts which attempt to show any ground for relief, but they have no legally enforceable rights to engage in legal research.[2] Since it has not been shown that Chessman was being deprived of any rights at the time of the making of the superior court order, and since that order purports to declare that he is to be allowed future privileges to which he is not entitled, the order cannot be upheld.
For the reasons above stated, the motions of Chessman are denied; the writ of review is discharged and the review proceeding is dismissed; the order on habeas corpus is reversed and the cause on habeas corpus is remanded to the superior court with directions that the writ be discharged, the petitioner be remanded to the custody of the warden, and the proceeding be dismissed. Let the remittiturs issue forthwith.
Gibson, C.J., Shenk, J., and Spence, J., concurred.
Edmonds, J., and Traynor, J., concurred in the judgment.
CARTER, J.
I dissent.
I see no occasion for reading words into section 1506 of the Penal Code which makes appealable only an order of the *11 superior court which discharges petitioner from custody. It has been held repeatedly that in only those situations expressly covered by section 1506 was an order in habeas corpus proceedings appealable because the rule prior to its enactment had been that the state could not appeal. (In re Alpine, 203 Cal. 731 [265 P. 947, 58 A.L.R. 1500]; In re Bruegger, 204 Cal. 169 [267 P. 101]; Thuesen v. Superior Court, 215 Cal. 572 [12 P.2d 8]; Loustalot v. Superior Court, 30 Cal.2d 905 [186 P.2d 673]; In re Merwin, 108 Cal. App. 31 [290 P. 1076]; In re Dutton, 119 Cal. App. 447 [6 P.2d 558].) The Bruegger case states the reason for the rule: "The primary purpose of the writ of habeas corpus is to provide a summary and speedy mode of inquiring into the legality of imprisonment or restraint ... the writ would be deprived of its effect if an order made pursuant to the inquiry can be suspended, and the person or parties affected can be compelled to undergo the delay attendant upon an appeal to the higher court." (Emphasis added; In re Bruegger, supra, 204 Cal. 169, 171.) The use of the word "discharge" in section 1506 is plain enough. It can mean only one thing, release from custody. If there is any doubt as to its meaning it is completely dispelled by the remainder of the section which states that in case of such appeal defendant shall not be discharged from custody where the judgment of conviction has become final pending the appeal; however, defendant may be admitted to bail pending the appeal. If "discharge" is not limited to a release from custody these provisions in the section become meaningless.
Aside from the question of appealability I cannot agree with the majority opinion on the merits. While it is difficult to ascertain precisely what the holding is, the result is a complete reversal of the judgment. That reversal seems to be predicated upon the ground that because petitioner was given the facilities to which the order said he was entitled the question has become moot. In reaching that conclusion the majority ignores the fact that the evidence supports the order of the superior court in that the conduct of the prison authorities was such that it could at least be inferred that they would continue to withhold the facilities from petitioner unless a court ordered otherwise. It is similar to a case in which an injunction is sought, and there is a showing of threatened injury by defendant, but after the injunction is ordered he says he will be a "good boy." His belated repentance furnishes no basis for reversing the judgment granting the *12 injunction. The majority opinion purports to decide the question anew in spite of its being bound on appeal by the conclusion of the trial court on conflicting evidence.
The evidence shows that the prison authorities delayed for 14 days in permitting petitioner to have access to the courts; that despite the advice of the attorney general petitioner was deprived of such access; that petitioner was deprived of his personal books and papers and prevented from working on his case; indeed, this is admitted by the warden and he insisted on his right to do so; that the warden refused to permit petitioner to consult with an attorney whom petitioner had requested to call at the prison and consult with him and the warden testified that if petitioner asked to see that attorney again, "I am not prepared to say whether or not we would approve it." All of these things justified the superior court in concluding that there existed a real danger that the prison authorities would continue to deny the rights to which petitioner was entitled. It is of little significance that at the time of the hearing petitioner was not being deprived of his rights. That constituted nothing more than a conflict in the evidence on the question of what the warden's future conduct would be. Or it might be viewed as a confession that they had been wrong in their action and, in effect, a stipulation that the order made by the trial court should be made. Judicial protection of the rights of a prisoner would indeed be a mockery if the courts would always accept the pious protestations of the prison authorities that the rights would be accorded and then blithely disregard them the next day, leaving the prisoner to commence again his weary journey through the court process toward a chimerical goal. Such conditions are intolerable in a civilized society, yet this court now espouses them.
In mandamus proceedings it has been held that the writ is proper where the conduct of the officers indicates they do not intend to perform their duty. In Imperial Mut. L. Ins. Co. v. Caminetti, 59 Cal. App.2d 494, 497 [139 P.2d 693], the court said: "[T]he general rule is that the act sought to be compelled by mandamus must be one to the performance of which the party is entitled at the time the proceeding in mandate is instituted ... but that rule is subject to a kindred rule that mandate may be resorted to when it appears from the conduct or declarations of the officer or board, that they do not intend to comply with their obligation ... when the time for such action arrives.... To insist in an equitable proceeding such as mandate is, and under the facts and circumstances *13 here present, that petitioner should have been compelled to file a petition for renewal of its license for the few days between June 15th and June 30th, 1941, and then, subsequent to July 1st, file another petition for the ensuing fiscal year ending June 30, 1942, would do violence to the rule enunciated in section 3532 of the Civil Code, which reads `The law neither does nor requires idle acts.' Equity will also consider the fact that there is no showing of prejudice to appellant commissioner by reason of the time when the action herein was filed.... Equity does not look with favor upon litigation by piece-meal, and whenever possible will dispose of the entire controversy between the parties, will grant complete relief and whenever possible will settle and determine all differences between the parties in the one action, leaving nothing for further litigation between the same parties and upon the same subject-matter."
With reference to injunctions the rule has been stated to be: "However, the mere cessation by defendant of the alleged acts or conduct, before or after the beginning of a suit for injunction, has been held not a bar to the issuance of an injunction, and in a proper case, as where there is a reasonable ground to believe that there will be a resumption of such activities, a court of equity may issue an injunction." (43 C.J.S., Injunctions, § 22(d); see also Boggs v. North American Bond etc. Co., 6 Cal.2d 523 [58 P.2d 918].)
The rights assured to petitioner by the order of the superior court are important and any impairment thereof must be carefully scrutinized. It is said in Ex parte Hull, 312 U.S. 546, 549 [61 S.Ct. 640, 85 L.Ed. 1034]: "[T]he state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus. Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." The court said in In re Rider, 50 Cal. App. 797, 799 [195 P. 965]: "The right of an accused, confined in jail or other place of detention ... to have an opportunity to consult freely with his counsel without any third person, whose presence is objectionable to the accused, being present to hear what passes between the accused and his counsel, is one of the fundamental rights guaranteed by the American criminal law  a right that no legislature or court can ignore or violate. In this state, the right of an accused to consult with his counsel is guaranteed by the constitution, which, in section 13 of article I, expressly *14 declares that `in criminal prosecutions, in any court whatever, the party accused shall have the right to ... appear and defend, in person and with counsel.' This clause of the constitution unquestionably was adopted to secure to the accused person all the benefits which may flow from the employment of counsel to conduct his defense. To afford him those benefits it is essential that he should be allowed to consult with his counsel, not only during the actual trial, but prior thereto, in order to prepare for his defense. The privilege of the presence of counsel upon the trial would be a poor concession if the right of consultation with such counsel prior to the trial were denied. It is equally essential to the enjoyment of this constitutional guarantee that the accused should have the right to a private consultation with his counsel. As said by the Oklahoma criminal court of appeals, `It would be a cheap subterfuge of and a senseless mockery upon justice for the state to put a man on trial in its courts, charged with an offense which involved his life, liberty, or character, and then place him in such a position that he could not prepare to make his defense. It would be just as reasonable to place shackles upon a man's limbs, and then tell him that it is his right and duty to defend himself against an impending physical assault. If the right of defense exists, it includes and carries with it the right of such freedom of action as is essential and necessary to make such defense complete. In fact, there can be no such thing as a legal trial, unless both parties are allowed a reasonable opportunity to prepare to vindicate their rights.... It therefore necessarily follows that it is the absolute right of parties charged with crime to confer privately with their attorneys, and that it is an illegal abridgment of this right for a sheriff, jailer, or other officer to deny to a defendant the right to consult his attorneys except in the presence of such officer.... It is the duty of officers having the custody of persons charged with crime to afford them a reasonable opportunity to privately consult with their attorneys, without having other persons present, taking such precautions as may be necessary, according to the circumstances of each case, to prevent the escape of such prisoner.'" (See also In re Robinson, 112 Cal. App.2d 626 [246 P.2d 982].) There is no basis whatsoever for the statement in the majority opinion that petitioner is seeking or sought or was granted "special privileges." The rights sought by petitioner and granted by the trial court are the rights which must be accorded to all prisoners if the *15 concept of "equal justice under law" is to have any significance whatever.
The majority states that prisoners have a right to prompt and timely access to the mails "for the purpose of transmitting to the courts" facts which show ground for relief but they "have no legally enforceable rights to engage in legal research." For that conclusion it cites the code sections to the effect that petitioner is civilly dead. What bearing that has on a prisoner's right to defend himself does not appear. If he may transmit "facts" to the courts in an attempt to obtain relief he should also be entitled to transmit legal propositions. To do either requires reasonable opportunity to prepare the facts and the law. If that requires legal research then a reasonable opportunity therefor should be given. The order of the trial court here did not go beyond the bounds of reason. Certainly it cannot be said its order is so unreasonable that it abused its discretion.
The majority decision here is another, in a long line of decisions by this court, in which this petitioner has been denied his constitutional rights. (See People v. Chessman, 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084]; People v. Chessman, 38 Cal.2d 166 [238 P.2d 1001]; In re Chessman, 43 Cal.2d 408 [274 P.2d 645].)
I would affirm the order here under review.
The application of respondent on appeal in Crim. No. 5591 and Real Party in Interest in S.F. No. 19158 for a rehearing was denied March 3, 1955. Carter, J., and Traynor, J., were of the opinion that the application should be granted.
NOTES
[1] Petitioner continued to represent himself in these proceedings until November 8, 1954, when Mr. Berwyn Rice was appointed to represent him. On November 24, at Chessman's request, the appointment of Mr. Rice was terminated. At oral argument Miss Rosalie Asher appeared for Chessman.
[2] "A person sentenced to death is deemed civilly dead during the existence of the death sentence." (Pen. Code, § 2602.) Also, because Chessman is under sentence to life imprisonment he is deemed civilly dead (Pen. Code, § 2601) and because he is under sentence to imprisonment for terms less than life his civil rights are suspended (Pen. Code, § 2600).