[Crim. No. 10257. In Bank. Mar. 28, 1967.]

In re CHARLES ALLISON on Habeas Corpus.

Charles Allison, in pro. per., and Ralph D. Drayton, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Respondent.

MOSK, J.—Petitioner, an inmate of San Quentin Prison, complains by this application for habeas corpus of the conditions of his confinement. The allegations of the petition, prepared in propria persona, may be construed as charging that he has been denied the right to communicate with counsel and the opportunity to engage in legal research, and that he has been subjected to harassment and acts of brutality by prison personnel.

The writ of habeas corpus may be sought by one lawfully in custody for the purpose of vindicating rights to which he is entitled even in confinement. (*In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304], and cases cited.) We issued an order to show cause and appointed coun-

sel to represent petitioner in this proceeding. Upon examining the thorough documentation appended to the Attorney General's return, however, we have concluded that petitioner has in fact suffered no deprivation of rights and hence that no relief is warranted.

*Right to communicate with counsel.* Petitioner was convicted in the Sacramento Superior Court on two counts of forcible rape, two counts of oral copulation accomplished by threats of great bodily harm, one count of assault with intent to rape, and three counts of burglary. He appealed from the judgment, and Laurence L. Angelo, a Sacramento attorney, was appointed to represent him. Petitioner alleges that on July 7, 1966, while confined in San Quentin, he received a letter from Mr. Angelo asking him "to let him know about several errors in the Attorney General's brief, before July 11, 1966"; that the only way a reply would have been timely was by telegram; and that a prison official refused him permission to send such a telegram, saying that petitioner was a "writ writer" and that he wasn't sending anything for a writ writer. Petitioner alleges the official further told him that three letters petitioner had directed to Melvin Belli, a San Francisco attorney, had not been sent out of the prison. Finally, petitioner alleges that on September 1, 1966, while in isolation, he addressed a letter to Mr. Angelo, but that the letter was returned to him on September 7, with the notation, "postage denied."

In *In re Chessman* (1955) 44 Cal.2d 1, 9 [279 P.2d 24], we reaffirmed the rule that "a prisoner is entitled to, and habeas corpus is available to enforce . . . [his] right, at reasonable times, to consult privately with his counsel *in preparation for trial* (*In re Rider* (1920) 50 Cal.App. 797, 799 [195 P. 965]; *In re Snyder* (1923) 62 Cal.App. 697, 699 [217 P. 777]; *In re Qualls* (1943) 58 Cal.App.2d 330, 331 [136 P.2d 341])." (Italics added.) The right to consult includes the right, at reasonable times, to communicate with counsel by mail and, when necessary in the circumstances, by telegram. These rights attach not only while preparing for trial, but also during the pendency of an appeal. When a prisoner is represented by an attorney of record, moreover, it is not unreasonable to limit his exercise of such rights to consultation with that attorney, and to deny him access to other attorneys not of record. (*Ibid.*) But when the appeal has been decided the attorney of record is ordinarily relieved of further duties in the case, and this fact may not be used to

deprive the prisoner of the right to thereafter communicate with other counsel for the purpose of interesting them in whatever collateral remedies he may have. ██ As we observed in *In re Ferguson* (1961) 55 Cal.2d 663, 677 [12 Cal. Rptr. 753, 361 P.2d 417], "it is manifest that the right of a prisoner to petition a court for redress of alleged illegal restraints on his liberty is unreasonably eroded if the prison authorities may be allowed to deny a prisoner the opportunity of procuring counsel, so that his petition for writ of habeas corpus or other mode of redress always must be presented in propria persona. . . . Therefore, it is an abuse of discretion for prison regulations to be utilized so as to deny an inmate the opportunity to procure with reasonable promptness, or to communicate with in a reasonably prompt manner, a member of the Bar on matters pertaining to alleged violations of the prisoner's legal rights allegedly suffered as a direct result of incarceration, even though the letter to the attorney may be critical of the prison authorities. [Fn. omitted.]"

██ Here, however, petitioner has been accorded full measure of his right to communicate and consult with counsel. The prison mail records disclose that during the pendency of his appeal, i.e., until December 1966, letters from petitioner to Mr. Angelo were sent from the institution on at least 23 separate occasions, and replies were received with similar frequency. Contrary to petitioner's allegation that a prison official refused him permission to send a telegram to Mr. Angelo by July 11, 1966, such a telegram was sent on that date; in it, petitioner instructed Mr. Angelo to "handle those errors the best way you see fit," and indicated his confidence in his counsel. Other prison records show that during this same period Mr. Angelo made three visits to San Quentin from Sacramento to consult in person with petitioner. As a result of Mr. Angelo's efforts, the Court of Appeal reversed the judgment against petitioner as to the three burglary counts, while affirming the remainder. (*People* v. *Allison* (1966) 245 Cal.App.2d 568 [54 Cal.Rptr. 148].)

Indeed, petitioner has abused his right to communicate with counsel. Even though Mr. Angelo was his active attorney of record until the denial of a petition for hearing in this court on December 7, 1966, petitioner continued to write letters of unspecified content to other attorneys throughout his appeal. Thus the prison records show letters, which generally went unanswered, mailed for petitioner to such unauthorized at-

torney recipients as Melvin Belli, Vincent Hallinan, and Marshall Krause; and on July 11, 1966, the same day petitioner expressed his "confidence" in Mr. Angelo, he was allowed to send a telegram to Mr. Belli, offering to pay all expenses "for an interview at San Quentin Prison."

*Opportunity to engage in legal research.* Petitioner alleges that he was denied the use of the prison law library from May 25 to June 10, 1966, while his privilege card was suspended, and for the first two weeks of September 1966, while he was in isolation. He charges that on June 6, 1966, his cell was searched and his "legal papers were scattered" and "All the research petitioner had pertaining to his case on appeal was destroyed." Finally, he complains generally of the inadequacy of the legal materials in the prison library and the hours at which he is permitted to use them. He prays that the warden be restrained from confiscating "any and all papers and legal materials" in his possession and from suspending his privilege card, and show cause why he is depriving petitioner of his "legal rights" to "Daily use of the law library," "Access to any and all legal reference volumes necessary to aid petitioner on his appeal," and in the event these facilities prove unsatisfactory, "use of the Marin County Law Library twice weekly, all day. . . ."

■ The fundamental right in issue here is that of reasonable access to the courts. Denial or undue restriction of this right is a denial of the due process of law guaranteed to state prison inmates by the Fourteenth Amendment. (*Cochran* v. *Kansas* (1942) 316 U.S. 255, 257-258 [86 L.Ed. 1453, 62 S.Ct. 1068]; *Ex parte Hull* (1941) 312 U.S. 546, 549 [85 L.Ed. 1034, 61 S.Ct. 640]; *De Witt* v. *Pail* (9th Cir. 1966) 366 F.2d 682, 685; *Hatfield* v. *Bailleaux* (9th Cir. 1961) 290 F.2d 632, 636.) ■ The primary function of the right is to insure full and timely judicial review, if desired by the prisoner, of his judgment of conviction; hence "the state has no power to deny a person the right to file in any court a petition or other document which purports to seek some remedy or relief relating to *the offense for which he was imprisoned.*" (Italics added.) (*In re Robinson* (1952) 112 Cal.App.2d 626, 629 [246 P.2d 982]; accord, *In re Chessman* (1955) *supra,* 44 Cal.2d 1, 9; *People* v. *Howard* (1958) 166 Cal.App.2d 638, 642-643 [334 P.2d 105]; *In re Malone* (1952) 112 Cal.App.2d 631 [246 P.2d 984].) A secondary function has developed coincident with the expansion of the scope of relief available to a prisoner on habeas corpus; in this respect the right of access permits

the prisoner to bring to the attention of the courts alleged violations of his post-conviction rights "suffered as a direct result of incarceration," such as the infliction of cruel and unusual punishment in prison (*In re Riddle* (1962) *supra*, 57 Cal.2d 848; *In re Jones* (1962) 57 Cal.2d 860 [22 Cal.Rptr. 478, 372 P.2d 310]; *In re Cathey* (1961) 55 Cal.2d 679, 694 [12 Cal.Rptr. 762, 361 P.2d 426]) or the imposition of unreasonable restrictions on his religious freedom (*In re Ferguson* (1961) *supra*, 55 Cal.2d 663).

In the present case the exhibits demonstrate that petitioner has not been denied access to the courts for either of the foregoing purposes. Manifestly he has obtained full judicial review of his judgment of conviction: a timely notice of appeal was filed, and through his attorney he filed opening and closing briefs, argued the case, and filed petitions for rehearing and hearing in this court. During the same period, moreover, he has been permitted to institute in propria persona a variety of proceedings complaining of the conditions of his confinement: thus between the months of June and September 1966, petitioner filed two applications for habeas corpus in the Marin Superior Court and one in the Court of Appeal, as well as two complaints in the United States District Court initiating civil rights actions against prison officials and various state judges, including the members of this court. The allegations of these pleadings are identical to those now before us; and each was denied or dismissed, with the exception of one in which a motion to dismiss is pending. In the same period he also filed the present petition in this court, followed by a supplemental petition making additional charges. Finally, prison mail records show that during the pendency of his appeal petitioner communicated with the clerks or officers of both state and federal courts on literally dozens of occasions.

The distinction between the fundamental right of access to the courts and the privilege here claimed by petitioner was clearly drawn in *In re Chessman* (1955) *supra*, 44 Cal.2d 1, 10: "prisoners have the right to prompt and timely access to the mails for the purpose of transmitting to the courts statements of facts which attempt to show any ground for relief, but they have no legally enforceable rights to engage in legal research. [Fn. omitted.]" (Accord, *In re Ferguson* (1961) *supra*, 55 Cal.2d 663, 677, fn. 1.) There is no statutory right to engage in such research; nor is there any constitutional duty laid upon the states to provide facilities for that purpose, so long as access to the courts is not thereby unrea-

sonably impeded. Thus in *Hatfield* v. *Bailleaux* (9th Cir. 1961) *supra,* 290 F.2d 632, 640-641, the court observed that "State authorities have no obligation under the federal Constitution to provide library facilities and an opportunity for their use to enable an inmate to search for legal loopholes in the judgment and sentence under which he is held, or to perform services which only a lawyer is trained to perform. All inmates are presumed to be confined under valid judgments and sentences. If an inmate believes he has a meritorious reason for attacking his, he must be given an opportunity to do so. But he has no due process right to spend his prison time or utilize prison facilities in an effort to discover a ground for overturning a presumptively valid judgment.

"Inmates have the constitutional right to waive counsel and act as their own lawyers, but this does not mean that a nonlawyer must be given the opportunity to acquire a legal education. One question which an inmate must decide in determining if he should represent himself is whether in view of his own competency and general prison regulations he can do so adequately. He must make the decision in the light of the circumstances existing. The state has no duty to alter the circumstances to conform with his decision.

"Underlying the conclusions stated above is the fact, not to be overlooked, that inmates of a penitentiary are undergoing punishment for crimes of which they have been convicted. 'Lawful incarceration,' as the Supreme Court said in *Price* v. *Johnston,* 334 U.S. 266, 285 [92 L.Ed. 1356, 1369, 68 S.Ct. 1049, 1060], 'brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' "

The United States Supreme Court denied certiorari (368 U.S. 862), and subsequent federal decisions are in accord (see, e.g., *Lee* v. *Tahash* (8th Cir. 1965) 352 F.2d 970, 973-974; *Roberts* v. *Pepersack* (D. Md. 1966) 256 F.Supp. 415, 433-434; *United States* ex rel. *Wakeley* v. *Commonwealth of Pennsylvania* (E.D. Pa. 1965) 247 F.Supp. 7, 13; *Austin* v. *Harris* (W.D. Mo. 1964) 266 F.Supp. 304, 307; but see *Johnson* v. *Avery* (M.D. Tenn. 1966) 252 F.Supp. 783). As summarized in *Siegel* v. *Ragen* (7th Cir. 1950) 180 F.2d 785, 788, "Obviously the right to practice law or to maintain a law department within the confines of a state penitentiary is not a right secured by the Constitution of the United States."

In California, nevertheless, legal research facilities have been made generally available to inmates of our state

prisons, although they are necessarily of limited scope and may be used only under specific rules. Pursuant to constitutional authority (Cal. Const., art. X, § 1), the Legislature has vested in the Director of Corrections the "supervision, management and control" of the state prisons (Pen. Code, § 5054) and has provided that he "may prescribe rules and regulations for the administration of the prisons and may change them at his pleasure" (Pen. Code, § 5058). Among the rules thus prescribed is rule D2601, which declares that "There shall be a suitable place in each institution where inmates, with the permission of the designated employee, may have access to study such law books as are available to them. No law books shall be taken from such place by any inmate. The use of law books by inmates in an institution is a privilege, not a right. Misuse of the privilege may result in its withdrawal." Implementing this directive in the present case is rule Q2601 of the Rules of the Warden, San Quentin State Prison: "Space has been provided in the library where inmates wishing to consult law books may do so during regular library hours. All law books available at the institution together with such law books as may be loaned to the institutional library from the State Library, may be obtained for study in the space designated. No books may be taken from this area. An inmate wishing to order a book from the State Library shall make his request to the Librarian who may in turn submit his request to the State Librarian. No inmate shall be allowed to have possession of law books as personal property. There shall be no exceptions to the above provisions unless special permission is given by the Warden."

In *Hatfield* v. *Bailleaux* (9th Cir. 1961) *supra*, 290 F.2d 632, 640, it was held to be "self-evident" that rules on legal research considerably more restrictive than the foregoing did not deny inmates reasonable access to the courts. The rules here applicable are reasonable; they are responsive to the practical limitations of space, materials, and staff available, and to the necessity of maintaining control over a large number of prisoners confined within narrow bounds. Equally reasonable are the 16-day suspension of petitioner's library privilege card because of a breach of discipline (see *In re Chessman* (1955) *supra*, 44 Cal.2d 1, 9) and the denial of his use of the library while confined for two weeks in isolation for a further violation of prison rules (see *Hatfield* v. *Bailleaux, supra,* 290 F.2d at pp. 637-638). Finally, it is not unreasonable to limit the legal research activities of a prisoner

who, like petitioner at the times here relevant, is actively represented by an attorney of record; and his complaint that prison personnel confiscated research materials found in his cell "pertaining to his case on appeal" should be viewed in that light. Even with respect to restrictions on the undoubted right of religious freedom, a federal court recently stressed that "the nub of this whole situation is not to be found in the existence of theoretical rights, but in the very practical limitations on those rights which are made necessary by the requirements of prison discipline." (*Sostre* v. *McGinnis* (2d Cir. 1964) 334 F.2d 906, 911.)

The exhibits disclose, moreover, that petitioner has taken ample advantage of the research facilities offered at San Quentin. Not only is this apparent from the number and complexity of the pleadings he has filed, but the prison library records specifically show that in the 11-month period from January to November 1966 he used the law library on 41 occasions, and consulted a total of 62 books. Nor was he barred from obtaining other lawbooks from the State Library: contrary to his allegation that he "has tried to obtain legal books from the State Library in Sacramento for seven months . . . and has never received one book," the records show that during this period petitioner made only one request for a State Library volume, and that request was honored.[1]

*Alleged harassment and brutality by prison personnel.* Petitioner charges "there exists in San Quentin a general conspiracy" to "harass" him, and claims two instances of brutality. He alleges that on June 2, 1966, he was reprimanded by a guard "in a rough, unnecessary tone of voice" for arriving late at his cell; that petitioner argued, "It isn't in the rule book to be here until the buzzer sounds"; and that the guard kicked the cell door shut on petitioner, causing a bruised muscle and pulled ligament in his back for which he received several heat treatments in the prison hospital. Petitioner further alleges that in August 1966 another guard

---

[1] The State Library offers the following sets of lawbooks for circulation to prison inmates: California Reports, 1st and 2d series, California Appellate Reports, 1st and 2d series, California Reporter, Pacific Reporter, 1st and 2d series, United States Reports, Supreme Court Reporter, United States Supreme Court Reports, Lawyers' Edition, 1st and 2d series, Federal Reporter, 1st and 2d series, Federal Supplement, Federal Rules Decisions, California Codes (State Printer's Ed.) and California Statutes. Currently some 500 to 600 volumes per month are being circulated in this program, and each may be retained for five weeks. Contrary to petitioner's allegation that he could order only five books per month, the State Library allows each prisoner five books per week.

stood on his foot for 10 minutes, and, while searching him, jerked his feet from under him, throwing him against a wall and "popping" a ligament in his back which again was the subject of heat treatment.

Although prisoners may not be subjected to corporal punishment (Pen. Code, §§ 673, 2652; cf. *People* v. *Sanchez* (1967) 65 Cal.2d 814, 825 [56 Cal.Rptr. 648, 423 P.2d 800]), "custodial officers may use reasonable force upon a prisoner to enforce proper prison regulations" (*In re Riddle* (1962) *supra*, 57 Cal.2d 848, 852). Here it appears that petitioner has posed an extensive disciplinary problem at the institution. The prison records reflect a continuing series of incidents in which petitioner has had to be punished for displaying indifference towards his work assignments and insolence or open hostility towards the personnel.[2]

In any event, the burden of proving that unreasonable force was used is on the petitioner, and it is a heavy one: "To be entitled to any relief he must allege and prove that cruel, inhuman, or excessive punishment was inflicted upon him in violation of his fundamental and basic rights." (*In re Riddle* (1962) *supra*, 57 Cal.2d 848, 852.) Even assuming petitioner's allegations in this respect to be true, he fails to show how the scuffles in question amounted to the infliction of "cruel, inhuman, or excessive" punishment. On the contrary, in a letter accompanying certified copies of petitioner's hospital records, Dr. W. L. Kaufman concludes that

---

[2]For example, a report of Correctional Officer Thomas states that on December 7, 1966, i.e., a few days after we issued our order to show cause, he suspended petitioner's privilege card for one week for a violation of rules, and the following occurred: "ALLISON then stated, 'Thomas, I'm going to get you when I get out. I'm going to fix you for good.' Because I was involved in running the noon feeding lines and unable to leave, I ordered ALLISON to remain with me until I could escort him to the Yard Office for further questioning. While standing amongst the noon lines, ALLISON began baiting me with insults in an attempt, I believe, to agitate me to the point that I would assault him. The subject said several times, 'Thomas, You're a punk; a motherfucking punk.' When ALLISON realized that I was not getting angry he turned to the inmates nearby and stated, 'This officer (indicating the writer) is my punk; I fuck him all the time.' This he also said several times. I presently turned my back to ALLISON in an attempt to ignore him and he began spitting around my feet. By this time a great many inmates had began to stare at us, and thinking that ALLISON might incite other inmates, I told him to go down to the other end of the yard and I would talk to him later. He refused to move; so I ordered him to leave the area. He again refused. I then asked him, 'Do you refuse to move?' to which he answered, 'Yes, I do.' I then grabbed his coat sleeve above the elbow and pulled him approximately ten feet, out of the feeding lines.''

"there is scant evidence of anything more than a common minor muscular complaint which is directly related often to the mental attitude of the patient." (Compare the severe beatings administered in *Riddle* and *In re Jones* (1962) *supra,* 57 Cal.2d 860, held to be not excessive under the circumstances.)

 In conclusion, it seems necessary to recall the admonition of *In re Riddle* (1962) *supra,* 57 Cal.2d 848, 852: "The courts are and should be reluctant to interfere with or to hamper the discipline and control that must exist in a prison. Petitions containing such charges must be carefully scrutinized and the facts carefully weighed with the thought in mind that they are frequently filed by prisoners who are keen and ready, on the slightest pretext, or none at all, to harass and to annoy the prison officials and to weaken their power and control. These prisoners include many violent and unscrupulous men who are ever alert to set law and order at defiance within or without the prison walls."

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Peek, J.,* concurred.

Petitioner's application for a rehearing was denied April 26, 1967. Sullivan, J., did not participate therein.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.