[No. 39641-2-I. Division One. December 13, 1999.]

*In the Matter of the Personal Restraint of* ROBERT
LEONARD ARSENEAU, *Petitioner.*

*Robert Leonard Arseneau,* pro se.

*Dennis Ott,* for petitioner.

*Christine O. Gregoire, Attorney General,* and *John S. Blonien* and *Michael T. Mitchell, Assistants,* for respondent.

APPELWICK, J. — In this personal restraint petition (PRP), prison inmate Robert L. Arseneau seeks relief from a Department of Corrections (DOC) prohibition preventing him from writing letters to his 11-year-old niece. Arseneau

argues that the prohibition violates his First Amendment right to free speech, denies him due process, and violates the ex post facto and double jeopardy clauses of the United States and Washington Constitutions. We reach the merits of Arseneau's claim. It relates to the "conditions or manner" of his confinement under RAP 16.4(c)(6) and implicates a constitutional right of significant importance. We deny the petition on the merits, however, because the DOC prohibition at issue is no more restrictive than necessary to protect the important governmental interests of furthering Arseneau's rehabilitation and preventing him from "grooming" his niece as a potential abuse victim.

## FACTS

In 1991, Arseneau pleaded guilty and was convicted of four counts of first degree incest. Arseneau had sexually abused his stepdaughter for 13 years, beginning when she was five years old. The stepdaughter became pregnant by these sexual contacts and had several miscarriages. Arseneau told her that he would kill her if she ever told anyone. When she refused his advances, he severely beat her.

At least one other girl claims that Arseneau abused her as well. The girl claims that Arseneau had sexual intercourse with her during August and September 1990, when she was 15 years old. She claims Arseneau warned her that if she told anyone, he would end up in jail, or her father would kill him.

At Arseneau's sentencing, the court imposed an exceptional sentence on each count, for a total of 180 months. The court also prohibited Arseneau from "having any contact, directly or indirectly, with [his stepdaughter] for a period of 10 years."

Once in prison, Arseneau began corresponding with his niece, Amanda Kohl, who resides with Arseneau's mother. Arseneau wrote to Amanda in June and July 1996, when she was 11 years old. Arseneau's early release date is November 20, 2001; Amanda will be 16 years old at the

time. There is no evidence that Arseneau ever sexually abused Amanda.

On June 30, 1996, DOC enacted and began enforcing policy 450.050. That policy allows prison officials to restrict or deny contact between an offender and "[an] individual or class of individuals [that] has/have been victimized by the offender." DOC 450.050. Linda Willenberg, the correctional program manager at Twin Rivers Correctional Center, believed the correspondence between Arseneau and Amanda was subject to DOC 450.050. Willenberg concluded that Amanda was "a young school age girl . . . in the class of individuals victimized by Mr. Arseneau." Willenberg prohibited the contact based on the policy.

Arseneau filed this PRP contesting the prohibition.

WHETHER THE CLAIM IS COGNIZABLE IN A PRP

As a threshold matter, DOC argues that Arseneau's claim is not cognizable in a PRP because the prohibition that he challenges does not relate to the validity of his conviction, sentencing or custody. DOC contends that the claim is not cognizable because Arseneau has an adequate remedy at law, namely a civil rights action under 42 U.S.C. § 1983. Because the claim here implicates a constitutional right of significant importance, we will reach the merits of the petition.

■ Bringing a successful claim in a PRP requires "a showing of restraint and an unlawful aspect of the restraint." *In re Personal Restraint of Metcalf*, 92 Wn. App. 165, 172, 963 P.2d 911 (1998) (citing RAP 16.4). The restraint must be unlawful for one of the reasons set forth in RAP 16.4(c). One of those reasons is that "[t]he conditions or manner of the restraint of petitioner are in violation of the Constitution of the United States." RAP 16.4(c)(6). Here, Arseneau is restrained—he is currently incarcerated. The prohibition preventing him from contacting his niece is one of the "conditions" of his incarceration, which implicates his First Amendment right to free speech. Thus,

the plain language of RAP 16.4(c)(6) does not per se prevent us from considering Arseneau's claim, even though it is unrelated to the validity of his incarceration.

■ The prohibition that Arseneau challenges implicates a constitutional right of significant importance. Prison inmates retain First Amendment rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974). Prison officials may not limit free speech rights without sufficient justification. We are persuaded to reach the merits of Arseneau's free speech claim.

DOC further argues that Arseneau's claim is not cognizable because he has another remedy available at law, namely a civil rights suit under 42 U.S.C. § 1983. DOC cites RAP 16.4(d) in support. That rule provides that a petitioner's claims are cognizable in a PRP only "if other remedies which may be available to petitioner are inadequate under the circumstances." DOC further contends that disallowing the present petition would be consistent with the AM. BAR Ass'N, ABA STANDARDS FOR CRIMINAL JUSTICE: POSTCONVICTION REMEDIES (2d ed. 1980 & Supp. 1986), and with federal law governing habeas corpus petitions.

As DOC asserts, Washington's PRP procedures were originally based on the ABA Standards: "[t]he relationship between a personal restraint petition and other remedies defined in [RAP 16.4(d)] is consistent with present law and is in accord with *ABA Standards Relating to Post-Conviction Remedies* (Approved Draft, 1968)." Rules of Court, RAP 16.4, cmt., 86 Wn.2d at 1244 (1976). In addition, the procedure established by the rules governing personal restraint petitions "supercedes the appellate procedure formerly available for a petition for writ of habeas corpus." RAP 16.3(b). Nonetheless, neither the ABA STANDARDS nor federal habeas corpus case law should deter us from reaching the merits of this petition.

Again, DOC is correct that the ABA STANDARDS clearly disallow an inmate from challenging in a collateral proceed-

ing a condition of confinement unrelated to the validity of confinement. The comment to the Standards states, "[o]ther claims, however, unrelated to the validity of conviction, sentence, or custody are not considered 'postconviction' proceedings. The burgeoning litigation concerning conditions within custodial institutions and civil rights of inmates is thus excluded from the scope of these standards." 22-1.1, at 7.

Nonetheless, the ABA STANDARDS are not persuasive authority here. They differ from the plain language of RAP 16.4(c)(6). According to the Standards, the following claims are cognizable in a postconviction proceeding: 1) claims "challenging judgments of conviction and sentence"; and 2) "claims challenging the legality of custody or restraint based upon a judgment of conviction, including claims that a sentence has been fully served or that there has been unlawful revocation of parole or probation or conditional release." 22-2.1, at 16. In contrast, RAP 16.4(c)(6) allows a petitioner to challenge "the conditions or manner of the restraint." On their face, Washington's rules differ from the ABA STANDARDS, allowing a broader type of action.

Furthermore, federal case law regarding habeas corpus actions does not clearly support DOC's position. DOC cites certain United States Supreme Court cases for the proposition that actions pertaining to individual and civil rights which do not implicate the fact of confinement, cannot be brought as habeas petitions. But the Supreme Court cases that DOC cites are not on point. Those cases hold only that inmates challenging actions related to the validity of confinement must first raise the issue in a habeas proceeding. *See Edwards v. Balisok*, 520 U.S. 641, 648, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) (inmate's constitutional challenge to disciplinary proceeding not cognizable under § 1983 because claim implied "the invalidity of the punishment imposed" and inmate had not previously brought habeas corpus action); *Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) (to recover damages for unlawful action that would render conviction

or sentence invalid, § 1983 plaintiff must prove that conviction or sentence was reversed on direct appeal, expunged by executive order, declared invalid by state tribunal, or called into question by federal writ of habeas corpus). These cases do not stand for the corollary proposition that actions pertaining to individual and civil rights *cannot* be brought as habeas petitions.

Furthermore, some state and federal courts have allowed inmates to challenge in collateral proceedings conditions of confinement unrelated to the validity of confinement, where other remedies were available at law. *See, e.g., Wilwording v. Swenson*, 404 U.S. 249, 250, 92 S. Ct. 407, 30 L. Ed. 2d 418 (1971) (per curiam) (allowing federal habeas action challenging prison living conditions and disciplinary measures where inmates had not exhausted possible remedies at law in state court); *Harris v. MacDonald*, 532 F. Supp. 36, 41 (N.D. Ill. 1982) ("a habeas petition challenging conditions of confinement may still be brought, even though § 1983 will also invariably be available in such cases."); *Wilson v. State of Idaho*, 113 Idaho 563, 746 P.2d 1022 (1987) (allowing constitutional challenges to conditions of confinement by means of habeas corpus petitions); *Harrah v. Leverette*, 165 W. Va. 665, 271 S.E.2d 322 (1980) (same); *In re Allison*, 66 Cal. 2d 282, 425 P.2d 193, 57 Cal. Rptr. 593 (1967) (same).

We hold that Arseneau was not required to exhaust his civil remedies before challenging the DOC prohibition in this collateral proceeding.

## STANDARD OF REVIEW

The parties disagree regarding the proper standard of review to apply in this case. Arseneau argues that we should review the constitutionality of the DOC prohibition at issue under the standard that the Supreme Court articulated in *Procunier v. Martinez*, 416 U.S. 396, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974). DOC argues that the appropriate standard is the more lenient standard set forth in

*Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). Because prison safety is not a concern here, we hold that the stricter *Martinez* standard applies.

The California Department of Corrections regulation at issue in *Martinez* censored outgoing mail from inmates to noninmates. *Martinez*, 416 U.S. at 398-99. In particular, the regulations censored letters in which inmates "unduly complain[ed]" or "express[ed] inflammatory political, racial, religious or other views or beliefs," or that were "otherwise inappropriate." *Id.* at 399-400. The Court held that censorship of outgoing prisoner mail was justified if: 1) the regulation or practice furthered an important or substantial governmental interest unrelated to the suppression of expression; and 2) the limitation of First Amendment freedoms was no greater than necessary to protect the particular governmental interest involved. *Id.* at 413. Applying this standard, the Court held that the regulations at issue were broader than any legitimate interest of security, order or rehabilitation demanded. *Id.* at 416. The *Martinez* Court based its ruling in part on the First Amendment rights of the nonprisoners who were receiving the letters. *Id.* at 408.

In the later case of *Turner v. Safley*, 482 U.S. 78, the Court established a more lenient standard for reviewing prison regulations limiting inmates' constitutional rights. The regulations at issue there restricted correspondence between inmates. *Id.* at 81-82. The Court held that prison regulations impinging on inmates' constitutional rights are valid when they are "reasonably related to legitimate penological interests." *Id.* at 89. This more lenient standard of review was required because "judgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment.' " *Turner*, 482 U.S. at 86 (quoting *Pell v.*

*Procunier,* 417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)).

In *Thornburgh v. Abbott,* 490 U.S. 401, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989), the Court clarified the relationship between the *Martinez* and *Turner* standards of review. The regulations at issue in *Thornburgh* authorized prison officials to reject incoming publications found to be detrimental to prison security. *Thornburgh,* 490 U.S. at 403. The Court stated that the more lenient *Turner* standard is appropriate in cases where the challenged regulations "are centrally concerned with the maintenance of order and security within prisons." *Id.* at 410. The Court reviewed the regulations at issue under that standard because the material censored, "reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.* at 412. The Court concluded that "the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. . . . The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Id.* at 413.

█ Clearly the more stringent standard set forth in *Martinez* applies here. The regulation prohibiting Arseneau from contacting his niece restricts outgoing prisoner mail only, and is minimally related to prison security. DOC does not allege any prison security interest. Thus, applying the *Martinez* standard, we must now determine whether the prohibition furthered an important government interest, and was no more restrictive than necessary to further that interest. *See Martinez,* 416 U.S. at 413.

## FIRST AMENDMENT

Arseneau argues that the outgoing mail restriction at issue violates his constitutional rights because it does not

further an important governmental interest. Even if it does, he further argues, the restriction is more restrictive than necessary to further that interest. We disagree.

The DOC prohibition, disallowing Arseneau's contact with his niece Amanda, furthers at least two important governmental interests. The first interest is to protect Amanda. Arseneau's contact with Amanda may constitute "grooming" behavior. Grooming has been described as behavior which tends to make a potential sex-abuse victim comfortable and to gradually sexualize the relationship. *State v. Braham*, 67 Wn. App. 930, 933, 841 P.2d 785 (1992). Willenberg, the prison official who prohibited the contact, attested that,

> [t]he contact appeared to create a 'special' relationship between Mr. Arseneau and Ms. Kohl. She was being placed in a situation where she was being treated by Mr. Arseneau as a target of his love and affection. The repeated terms of endearment directed to Ms. Kohl were likely to have an effect on her. . . . Mr. Arseneau appeared to be grooming Ms. Kohl for a relationship that presented risks to her.

Arseneau's letters and gifts to Amanda fit that description. Arseneau sent Amanda at least $70.00. The language in his letters, although not overtly sexual, is romantic. In a letter dated June 24, 1996, Arseneau wrote, "Hi honey," and concluded with "All my love sweetheart." On July 16, 1996, he wrote, "Hi again honey! hows everything going with you an [sic] everyone else? Come on now! you can tell me!" "So gramma spoils Monica ha? Well then I'll spoil you!" "Your [sic] not going to use this money to tease anyone else are you?" Moreover, Amanda will still be a minor if Arseneau is released on his earliest release date. The DOC prohibition furthers the important policy of protecting a child from possible future sexual abuse.

The second governmental interest that the prohibition furthers is Arseneau's rehabilitation. Arseneau is an untreated sex offender. One of the goals of treatment is to teach offenders to refrain from behavior that puts them at risk to reoffend. Willenberg concluded that Arseneau's let-

ters put him at risk. Arseneau's contact with Amanda might facilitate a sex offense.

Finally, the restriction was not more restrictive than necessary to further the governmental interests involved. DOC did not restrict all of Arseneau's mail, or even all of his outgoing mail, only his letters to Amanda. Furthermore, contrary to Arseneau's assertion, a prison official cannot arbitrarily exercise his or her personal beliefs in carrying out the policy. Restrictions on contact under DOC 450.050 are based on objective criteria, the class of individuals victimized by the offender. Arseneau also has alternate means to exercise his First Amendment rights. He can write and associate with other family members who do not fall into his class of victims. If a prohibition could not be imposed on the contact itself, prison officials would have to expend staff time and effort monitoring the content of letters to insure the contact had not risen to more inappropriate levels. Finally, Willenberg's restriction was not an exaggerated response. The restriction was narrowly tailored to meet the concerns facing the prison. We hold that the prohibition does not violate Arseneau's First Amendment rights.

## DUE PROCESS

■ Arseneau argues that the prohibition on his contact with Amanda also violates his due process rights. When an inmate's mail is restricted, the requirements for due process are satisfied if the inmate receives notice of the restriction and has a reasonable opportunity to protest, and if the restriction is reviewed by a third party who did not participate in the original decision. *See Procunier v. Martinez*, 416 U.S. 396, 418-19, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974).

Arseneau had constructive notice of the provisions of DOC 450.050. The regulation was in the library, and Arseneau received a copy of it from Pat Love, a grievance coordinator at the prison. Arseneau received copies of Willenberg's letters to Arseneau's mother terminating his

contact with Amanda. Arseneau complained to Love; she, a third party, reviewed his complaint and upheld the no-contact decision. Arseneau could have appealed the decision to the superintendent pursuant to the regulation, but did not exercise that right. DOC did not violate Arseneau's due process rights.

## EX POST FACTO AND DOUBLE JEOPARDY

Arseneau next argues that the prohibition at issue enhances the punishment for his original crime. Therefore, he contends, the prohibition violates the ex post facto and double jeopardy clauses of the United States and Washington Constitutions.

 The ex post facto clause forbids a state from enacting any law that imposes punishment for an act which was not punishable when committed, or increases the quantum of punishment annexed to the crime when it was committed. U.S. CONST., art. I, § 10; WASH. CONST., art. I, § 23; *State v. Ward*, 123 Wn.2d 488, 496, 869 P.2d 1062 (1994). The double jeopardy clause prevents both successive punishments and successive prosecutions for the same offense. *State v. Williams*, 85 Wn. App. 271, 277, 932 P.2d 665 (1997) (citing *United States v. Ursery*, 518 U.S. 267, 273, 116B S. Ct. 2135, 2139, 135 L. Ed. 2d 549 (1996)).

█ The mail prohibition here does not violate either constitutional provision, because it is not punitive. The punitive or regulatory nature of an act is determined in part by the legislature's purpose in adopting the law. *Ward*, 123 Wn.2d at 499. Here, the policy states that its purpose is to establish guidelines for safeguarding legitimate penological interests in regulating offender contact. DOC 450.050.

The effect of the regulation must also be examined. The effect must not be so punitive as to override its regulatory intent. *Ward*, 123 Wn.2d at 499. The following factors are to be considered: 1) whether the sanction involves an affirmative disability or restraint; 2) whether it has been historically regarded as punishment; 3) whether it comes

into play only on a finding of scienter; 4) whether it furthers retribution and deterrence; 5) whether the behavior to which it applies is already a crime; 6) whether an alternative purpose to which it may rationally be connected is assignable for it; and 7) whether it appears to be excessive in relation to the alternative purpose assigned. *Id.* at 499 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963)).

The *Mendoza-Martinez* factors do not show a punitive effect here. The prohibition imposes an affirmative burden. Arseneau cannot contact Amanda. But no-contact provisions have not traditionally been considered punishment. They are civil in nature and designed to protect third parties. *See, e.g., Bering v. SHARE*, 106 Wn.2d 212, 721 P.2d 918 (1986) (prohibitions on contact and speech handled in civil context); *In re Marriage of Olson*, 69 Wn. App. 621, 850 P.2d 527 (1993) (same). The restriction does not depend on a finding of scienter. It is intended to regulate contact, not punish. Finally, the restriction is not exaggerated or excessive. It is specifically limited to the inappropriate contact between Arseneau and Amanda. Arseneau's term of confinement is not altered. Thus, neither the double jeopardy clause nor the ex post fact clause is implicated.

The petition is denied.

WEBSTER and COX, JJ., concur.