[S.F. No. 24515. Sept. 17, 1984.]

In re STEPHEN JOSEPH GANDOLFO on Habeas Corpus.

**COUNSEL**

Adrian Kuyper, County Counsel, and Daniel J. Didier, Deputy County Counsel, for Appellant.

Robert N. Chargin, Public Defender, and Jeffrey L. Hirschfield, Deputy Public Defender, for Respondent.

## OPINION

**THE COURT.**\*—We granted a hearing in this proceeding, after decision by the Court of Appeal, Third Appellate District, for the purpose of giving further study to the problems presented. After such review, we have concluded that the portion of Justice Blease's opinion for the Court of Appeal, concurred in by Acting Presiding Justice Evans and Justice Reynoso, set forth below, properly resolves the matter and we adopt it as and for the opinion of this court; additional issues discussed by the Court of Appeal have been eliminated as unnecessary. The opinion (with appropriate deletions and additions as indicated) is as follows:†

This is an appeal from a final order of the Superior Court of San Joaquin County granting habeas corpus relief (Pen. Code, § 1507; Cal. Rules of Court, rule 50) and directing appellant James E. Heim, the Orange County Public Guardian, to place respondent Stephen J. Gandolfo, his conservatee, in a "suitable" facility less restrictive than Stockton State Hospital, in which he had been placed pursuant to provisions of the Lanterman-Petris-Short (LPS) Act. (Welf. & Inst. Code, § 5000 et seq.) We consider whether it was proper to grant the writ in the face of an order of the Superior Court of Orange County, entered six weeks prior to the order here, directing Heim to place Gandolfo at Stockton State Hospital. We conclude, following *Browne* v. *Superior Court* (1940) 16 Cal.2d 593 [107 P.2d 1, 131 A.L.R. 276], that it was not and vacate the order.

---

\*Before Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Grodin, J., and Woolpert, J.‡

†Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.) Footnotes in brackets have been added by this court and the footnotes of the Court of Appeal have been renumbered to accommodate our additions.

‡Assigned by the Chairperson of the Judicial Council.

## FACTS

On March 16, 1979, Heim was appointed as Gandolfo's conservator pursuant to Welfare and Institutions Code section 5350, based upon a determination that Gandolfo was "gravely disabled."[1] Heim was empowered "to require [that Gandolfo] receive treatment related specifically to remedying or preventing the recurrence of the conservatee's being gravely disabled; [and] . . . [¶] . . . to require [him] to be detained in a facility providing treatment for the developmentally disabled; . . ." ([] §§ 5357, subd. (d); 5358.) Shortly afterward, Gandolfo, then 23 years of age, was placed in Stockton State Hospital.

After Gandolfo sought release from the hospital under former Health and Safety Code sections 38120 and 38121 (repealed by Stats. 1977, ch. 1252, § 352, oper. July 1, 1978, and replaced by [] §§ 4800 and 4801 [added by Stats. 1977, ch. 1252, § 550, oper. July 1, 1978]), the San Joaquin County Superior Court on November 14, 1979, granted habeas corpus relief, on the basis of section 4801, but delayed Gandolfo's discharge for one month to permit Heim to determine Gandolfo's eligibility for commitment under [] section 6500 as a "mentally retarded person . . . [who] is a danger to himself or others." At Heim's request, the court set aside the order and scheduled a new hearing. At that hearing, [on January 14, 1980,] the court denied Gandolfo's request for relief, treating it as one under [] sections 5275 and 5276, which relate to 14-day certifications for intensive treatment of persons found to be a danger to others or to themselves, or to be gravely disabled, as a result of mental disorder or impairment by chronic alcoholism. ([] § 5250.)

On April 23, 1980, after Gandolfo again requested his release, the San Joaquin County Superior Court granted the habeas corpus relief on the ground that he was "not gravely disabled to the extent that he need be maintained in a locked institution." It ordered that he be released from Stockton State Hospital within 30 days for possible placement in Palm Springs or Santa Barbara, where his parents separately resided. Gandolfo was then returned to Orange County to await a hearing on the reappointment of Heim as his conservator for another year.

---

[1] Welfare and Institutions Code section 5350 provides: "A conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of mental disorder or impairment by chronic alcoholism. . . ." Section 5008, subdivision (h)(1), defines the term "gravely disabled" to include "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter . . . ."

[Unless otherwise indicated, all section references are to the Welfare and Institutions Code.]

On June 4, 1980, the Orange County Superior Court again appointed Heim as Gandolfo's conservator. It found Gandolfo both "gravely disabled" and "developmentally disabled," and also found Stockton State Hospital to be the "most suitable placement" for him. Based on this finding, it ordered Heim to "place the conservatee at Stockton State Hospital." After Gandolfo sought his release for the third time, the San Joaquin County Superior Court again granted the requested habeas corpus relief, on August 25, 1980. It found that Gandolfo's "condition [was] such that there [was] no reason he ha[d] to stay in such a restrictive environment as Stockton State Hospital; that he [was] not gravely disabled to the extent that it necessitate[d] his remaining in a locked facility," that "[h]is behavior [was] not dangerous to himself or others in the [preceding] six weeks," that "[h]is father [was] willing to try to handle him," and, finally, that "Stockton State Hospital [was] not the proper place for him." The court recommended that placement be near his father. After [the Court of Appeal] denied Heim's petition for a writ of mandate or prohibition (3 Civ. 19963), this appeal followed.

DISCUSSION

[]

We agree with Heim that *Browne* v. *Superior Court, supra,* 16 Cal.2d 593, is dispositive of the case. In *Browne,* the Superior Court of Santa Barbara County adjudged an elderly woman incompetent and appointed one of her sons as the guardian of her person and estate. Some time later, following medical advice, she went to live in a convalescent home in San Francisco. Another son encouraged her to return to Santa Barbara but her physician opposed the move as dangerous and her guardian asked the superior court for instructions. It directed the guardian to keep his mother in San Francisco. When the brother's application for habeas corpus in the San Francisco Superior Court was granted and the case set for hearing, the guardian sought and obtained a writ of prohibition preventing the trial court from proceeding. (*Id.,* at pp. 595-597.) The [*Browne*] court referred to the "familiar proposition that where several courts have concurrent jurisdiction over a certain type of proceeding, the first one to assume and exercise such jurisdiction in a particular case acquires an exclusive jurisdiction." (*Id.,* at p. 597.) ■ In a guardianship proceeding, the court observed, the trial court retains jurisdiction to supervise the guardian until he is discharged. (Accord *Guardianship of Tulley* (1978) 83 Cal.App.3d 698, 705 [146 Cal.Rptr. 266].) ■ "In carrying out his duties of administration he acts under the authority and supervision of the court which appointed him, must

render accountings, may petition for instructions, and is subject to liability or removal for misconduct. ■■■ The jurisdiction of the court in this respect is a continuing one, and though no motion, petition or other such incidental proceeding may be pending at any particular time, the court still has jurisdiction over the guardianship. No other court, we believe, has power to interfere with that continuing control over the guardian; no other court could receive and approve his accounting, or instruct him as to his duties. The San Francisco Superior Court cannot, in this *habeas corpus* proceeding, enter into any consideration of the propriety of the medical or other care of Mrs. Browne, her residence, the extent of supervision over her visitors, mail or other personal activities, or any other matters connected with her guardianship. The allegation that she desires to return to Santa Barbara has no legal significance under the facts recited; no more significance, indeed, than her personal preference as to doctors, drugs or treatment. Under the law her guardian must choose her place of residence (Prob. Code, [§] 1500) and the Santa Barbara court has fully considered all matters pertaining thereto. These are all wholly within the jurisdiction of the Santa Barbara court, and are beyond the scope of any proceeding in *habeas corpus."* (*Browne* v. *Superior Court, supra,* 16 Cal.2d at p. 598.) In the court's view, "the matters sought to be determined [in the proceeding], namely, the residence and method of treatment of the ward, [were] exclusively within the jurisdiction of the Santa Barbara court, and outside the scope of the writ of *habeas corpus."* (*Id.,* at p. 599.)

In response to an argument that requiring her to live in San Francisco and placing limits upon her right to receive mail and visitors amounted to an " 'unreasonable restraint upon her personal liberties' " cognizable in a habeas corpus proceeding (*ibid.*), the court "assume[d] that if the guardian of the incompetent herein, without instruction or authorization from the court, took the ward away from her home to an unsatisfactory place of residence, or unjustifiably confined or imprisoned her so as to deny her the pleasures of visiting her family or friends, or deprived her of the opportunity to receive medical care by preventing her from seeing a physician, these restraints might, in the absence of another adequate remedy, be the subject of inquiry on *habeas corpus.* ■■■ The guardian has the custody and care of the ward, but the ward is not his prisoner. *He may limit her activities in a reasonable manner, for her own benefit, but cannot, without good reason, deny her such freedom as is essential to her welfare."* (Last italics added.) (*Id.,* at pp. 600-601.) This was in stark contrast to the facts of the case before it and the court concluded: "The guardian is not arbitrarily confining or limiting the freedom of the ward upon his own initiative. He is acting under the instructions of the court having jurisdiction of the guardianship, and the court gave those instructions after the fullest possible hearing, and upon ample and practically conclusive testimony that the particular course

of conduct prescribed was for the best interests of the ward. The court may have been wrong then, and it may be wrong now. For the error it may have committed then, appellate review was possible. For the error it may be committing now, an application to that court, which has continuing jurisdiction of the guardianship, is still possible. Evidence as to the condition, the needs and the desires of the ward may be presented to that court on her behalf, and the fairness of the hearing or the correctness of the decision may be reviewed on appeal. But in the present circumstances there is no possible ground for *habeas corpus.* There is no illegal restraint whatever. Everything has been done in accordance with the lawful orders of a court with jurisdiction to make them, upon evidence which fully supports the orders. If the guardian were to permit what the application demands, he would be acting in violation of the orders of the Santa Barbara court, and would be answerable to that court for his misconduct." (*Id.,* at p. 601.)

■ We think this case is analytically indistinguishable from *Browne.* Here, the Orange County Superior Court appointed Heim as Gandolfo's conservator and authorized Gandolfo's placement in a state hospital. ■ ■ ■ ■ Subsequently, on his reappointment as guardian, it gave Heim a specific direction regarding Gandolfo's placement, just as the Santa Barbara court did in *Browne.*[2] ■ The San Joaquin County court's subsequent granting of habeas corpus flew directly in the face of the Orange County court's determination as to a proper placement of Gandolfo, a matter we have concluded was "exclusively within the jurisdiction of the [Orange County] court, and outside the scope of the writ of *habeas corpus.*" (*Browne* v. *Superior Court, supra,* 16 Cal.2d at p. 599.)

In *Browne,* [] [we were] concerned with preserving intact the appointing court's "continuing control" over the guardian. (*Id.,* at p. 598.) It was not for another court to correct its errors; the proper course for the ward to pursue her grievance was by direct appeal or by further applications to present evidence to the court of her conditions and desires in the exercise of its "continuing jurisdiction."

[2]Gandolfo points out that more than a year passed from Heim's original appointment in March of 1977 and his second in June 1980. He suggests that the Orange County court's jurisdiction was thus broken by the "automatic[]" termination of the first conservatorship and the June 1980 direction to place him in Stockton State Hospital is actually akin to the San Francisco habeas corpus ruling in *Browne* in that it was inconsistent with the San Joaquin County court's prior grant of relief. It is clear, however, that the pertinent statutes do not contemplate the extinguishment of the appointing court's continuing jurisdiction merely by a temporary interruption in the chain of conservatorship. [] [S]ection 5361, for example, provides for extension of a conservatee's confinement after the termination date whenever reappointment proceedings have not been completed. Similarly, under section 5363, the court may ratify the "good faith" acts of a conservator which occurred after the expiration of the one-year period "to provide continuity of authority in those cases where the conservator did not apply in time for reappointment."

The LPS Act, in addition to establishing safeguards on the initial appointment of a conservator,[3] provides procedures for conservatees to challenge the validity and conditions of their conservatorships. Conservatorships under the LPS Act terminate automatically after one year, at the end of which conservators must petition for reappointment with supporting medical evidence. ([] § 5361.) Conservatees are entitled to rehearings as to their status every six months. ([] § 5364.)[4] Section 5358.3[5] gives them the right to contest, also every six months, the rights denied them under section 5357 and the powers granted the conservator under section 5358.[6]

---

[3]"The professional person in charge of an LPS evaluation or treatment facility may recommend the appointment of a conservator for any person he determines is gravely disabled as a result of a mental disorder and who is unwilling or incapable of voluntarily accepting treatment ([] §§ 5350, 5352). A comprehensive investigation report containing all relevant information pertaining to the patient's medical, psychological, social, family, vocational and financial condition, must be prepared before the hearing (§ 5354). Conservatorship will be recommended only when there are no suitable alternatives available (§ 5354). The citation and a copy of the petition must be served upon the proposed conservatee at least 10 days before the hearing date (Prob. Code, § 1754). Where appropriate, the petition must specifically request that the proposed conservatee be deprived of [enumerated rights, such as the right to enter contracts, to drive, or to refuse medical treatment]. (§ 5357) [¶] Within 30 days from the date of the filing of the petition, a hearing must be held and the proposed conservatee must have counsel appointed within five days after the date of the petition (§ 5365). The proposed conservatee, on the advice of counsel, can demand a court or jury trial on the issue of grave disability, thereby waiving the hearing, or he can proceed with the hearing and be bound by the decision of the court (§ 5350, subd. (d))." (Fns. omitted.) (*Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 282-283 [139 Cal.Rptr. 357].) Upon the appointment of a conservator, the conservatee may be placed in an approved facility pursuant to court order. Outpatient treatment is encouraged. (§ 5358.6.) Family placement is preferred; if the conservatee cannot remain at home, he must be placed in the least restrictive setting consistent with needed treatment, as close as possible to his home or that of a relative. (§ 5358.)

[4][] [S]ection 5364 provides: "At any time, the conservatee may petition the superior court for a rehearing as to his status as a conservatee. However, after the filing of the first petition for rehearing pursuant to this section, no further petition for rehearing shall be submitted for a period of six months. If the conservatorship is terminated pursuant to this section, the court shall, in accordance with Section 707.7(c) of the Elections Code, notify the county clerk that the person's right to register to vote is restored."

[5][] [S]ection 5358.3 provides: "At any time, a conservatee or any person on his behalf with the consent of the conservatee or his counsel, may petition the court for a hearing to contest the rights denied under Section 5357 or the powers granted to the conservator under Section 5358. However, after the filing of the first petition for hearing pursuant to this section, no further petition for rehearing shall be submitted for a period of six months. [¶] A request for hearing pursuant to this section shall not affect the right of a conservatee to petition the court for a rehearing as to his status as a conservatee pursuant to Section 5364. A hearing pursuant to this section shall not include trial by jury. If a person's right to vote is restored, the court shall so notify the county clerk pursuant to Section 707.7(c) of the Elections Code."

[6]Prior to its amendment in 1976, section 5364 provided that "[a]t any time, but not more than once each six months, the conservatee may petition the superior court for a rehearing as to his status as a conservatee." In *Henreid* v. *Superior Court* (1976) 59 Cal.App.3d 552 [130 Cal.Rptr. 892], the Court of Appeal interpreted this language to mean that the six-month limitation on petitions for rehearing was applicable to a conservatee's *initial* petition

■ This is not to say that habeas corpus relief may never be had by a conservatee under the LPS Act. [] [As] in *Browne,* we "assume" that an unreasonable denial of "such freedom as is essential to [a conservatee's] welfare" might be a proper subject of inquiry on habeas corpus.[7] Thus, in *Henreid* v. *Superior Court, [supra,]* 59 Cal.App.3d 552, the court suggested that an LPS Act conservatee would be entitled to habeas corpus relief if "unreasonable consequences should ensue" because of the limitations of the statutory review mechanisms. *(Id.,* at p. 558; see also *Conservatorship of Munson* (1978) 87 Cal.App.3d 515, 520 [152 Cal.Rptr. 12] [habeas corpus relief available under Pen. Code, § 1473 for improper or illegal hospitalization].) This accommodation of the appointing court's authority and the conservatee's liberty interest finds a parallel in other cases where the validity of the confinement is not questioned, as the validity of the conservatorship order itself is not questioned here; in those cases habeas corpus has been used "to protect the fundamental basic rights of prisoners" though they remain confined. *(In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304].) ■ The placement of concededly gravely disabled conservatees in the least restrictive setting possible consistent with their needed treatment is unquestionably an important legislative policy.[8] ■

for rehearing as well as to successive petitions for rehearing.

Several months after *Henreid* was decided, the Legislature amended section 5364 to read, in relevant part: "At any time, the conservatee may petition the superior court for a rehearing as to his status as a conservatee. However, after the filing of the first petition for rehearing pursuant to this section, no further petition for rehearing shall be submitted for a period of six months." (Stats. 1976, ch. 905, § 5, p. 2080.) At the same time that it amended section 5364, the Legislature added a new provision, section 5358.3 (Stats. 1976, ch. 905, § 4, p. 2079), which affords a conservatee the right to seek a hearing with respect to the specific powers granted to a conservator—powers which include, for example, the authority to place the conservatee in a particular institution. As quoted above (see fn. 5, *ante),* the statutory language establishing the section 5358.3 hearing procedure is virtually identical to the amended version of section 5364.

Because Gandolfo never sought a hearing in the Orange County Superior Court pursuant to section 5358.3, we have no occasion in this proceeding to determine whether he was entitled to seek such a hearing within six months of the initial order or whether *Henreid's* interpretation of the pre-1976 language of section 5364 is still controlling.]

[7Thus, a petition for habeas corpus, filed in the county of confinement, would be an appropriate vehicle to inquire into the conditions of an institution which would endanger the health and safety of a conservatee (e.g., overcrowding, physical abuse, lack of medical treatment) or which deprive a conservatee of fundamental rights (e.g., restrictions on visiting, or receipt of mail, or religious freedom). (See generally *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470 P.2d 640]; *In re Allison* (1967) 66 Cal.2d 282, 285 [57 Cal.Rptr. 593, 425 P.2d 193].)]

8[] [S]ection 5358 (as amended by Stats. 1980, ch. 681, § 2) reflects this policy: "(a) When ordered by the court after the hearing required by this section, a conservator appointed pursuant to this chapter shall place his or her conservatee in the least restrictive alternative placement, as designated by the court. Such placement may include a medical, psychiatric, nursing, or other state-licensed facility, or a state hospital, county hospital, hospital operated by the Regents of the University of California, a United States government hospital, or other nonmedical facility approved by the State Department of Mental Health or an agency accredited by the State Department of Mental Health, or in addition to any of the foregoing,

However, "[i]t is often said that habeas corpus is not a proper remedy to review errors which could be raised on appeal or by other appropriate remedies . . . ." (Witkin, Cal. Criminal Procedure (1963) § 796, p. 768.) Here, the provisions of the LPS Act for challenging one's status as a conservatee and the powers of the conservator, as well as the right to appeal from [the appointing court's orders,] appear to be well suited, in ordinary circumstances, to enforcing the right to an appropriately nonrestrictive environment. The precise degree of restriction appropriate to a patient may change from day to day or week to week and a rule holding habeas corpus the proper mechanism for keeping up with those changes could only invite a hopeless flood of cases which would wreak havoc on the "continuing jurisdiction" of appointing courts. The availability of review every six months under the LPS scheme will *ordinarily* insure that any change in the conservatee's condition or other circumstance affecting the appropriateness of the restrictions placed on him is recognized within a reasonable time. Nevertheless, it may be that, in extraordinary circumstances, the statutory

---

in cases of chronic alcoholism, to a county alcoholic treatment center.

"(b) A conservator shall also have the right, if specified in the court order, to require his or her conservatee to receive treatment related specifically to remedying or preventing the recurrence of the conservatee's being gravely disabled, or to require his or her conservatee to receive other medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled which is necessary for the treatment of an existing or continuing medical condition. Except in emergency cases in which the conservatee faces loss of life or serious bodily injury, no surgery shall be performed upon the conservatee without the conservatee's prior consent or a court order specifically authorizing such surgery obtained pursuant to Section 5358.2.

"(c) If the conservatee is not to be placed in his or her own home or the home of a relative, first priority shall be to placement in a suitable facility as close as possible to his or her home or the home of a relative. For the purposes of this section, suitable facility means the least restrictive residential placement available and necessary to achieve the purposes of treatment. At the time that the court considers the report of the officer providing conservatorship investigation specified in Section 5356, the court shall consider available placement alternatives. After considering all the evidence the court shall determine the least restrictive and most appropriate alternative placement for the conservatee. The court shall also determine those persons to be notified of a change of placement.

"If requested, the local mental health director shall assist the conservator or the court in selecting a placement facility for the conservatee. When a conservatee who is receiving services from the local mental health program is placed, the conservator shall inform the local mental health director of the facility's location and any movement of the conservatee to another facility.

"(d) The conservator may transfer his or her conservatee to a less restrictive alternative placement without a further hearing and court approval. In any case in which a conservator has reasonable cause to believe that his or her conservatee is in need of immediate more restrictive placement because the condition of the conservatee has so changed that the conservatee poses an immediate and substantial danger to himself or herself or others, the conservator shall have the right to place his or her conservatee in a more restrictive facility or hospital. Notwithstanding Section 5328, if the change of placement is to a placement more restrictive than the court-determined placement, the conservator shall provide written notice of the change of placement and the reason therefor to the court, the conservatee's attorney, the county patient's rights advocate and such other persons designated by the court pursuant to subdivision (c)."

review procedures may be shown to be inadequate and to result in "unreasonable consequences" greatly detrimental to the conservatee. No such showing was made here, however. The trial court found merely that Stockton State Hospital was "not the proper place" for Gandolfo. More than this is required to justify interference with the continuing jurisdiction of the Orange County Superior Court. ■ ■■■■ [End of Court of Appeal opinion.][9]

We have no occasion to determine which of the various statutory habeas corpus procedures may be available to a conservatee in Gandolfo's position in a case in which habeas corpus is an appropriate remedy. Also, we note our quotations from the *Browne* decision should not be interpreted as an attempt to downgrade the importance of the habeas corpus procedure or an implied restriction on a court's jurisdiction to *accept* a habeas corpus petition. *Browne* was a product of the time when superior court habeas corpus jurisdiction did not extend beyond the county in which the petitioner was located. Since the 1966 constitutional amendment making superior court territorial jurisdiction statewide, we have fashioned a procedure which, if used in this case, would cause us to reach the same conclusion. (*Griggs* v. *Superior Court* (1976) 16 Cal.3d 341, 347 [128 Cal.Rptr. 223, 546 P.2d 727].) ■ Ordinarily, a "Griggs transfer" is required when the matter in dispute concerns the orders of another superior court.

The order granting habeas corpus is reversed.

**BIRD, C. J.**—I respectfully dissent for I cannot agree to the restrictions placed by the majority on the great writ of habeas corpus.

The Superior Court of San Joaquin County properly granted habeas corpus relief to Gandolfo. The court acted within the scope of its jurisdiction

---

[9]Contrary to the dissent's assertion, this conclusion does not deny gravely disabled persons equal protection of the law. Although the dissent apparently assumes that a developmentally disabled person who has been committed pursuant to a judicial proceeding required by this court's decision in *In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282], may relitigate the appropriateness of the commitment in the county of confinement without any limitation, there is no authority which supports that conclusion. In *Hop* itself, we simply held that a developmentally disabled person "is entitled to the *same* congeries of rights" as proposed conservatees under the LPS Act. (Italics added.) (*Id.*, at p. 93.)

Furthermore, even if there were some difference in the applicable procedures in this regard, it does not follow that constitutional guarantees would be violated. While we have been zealous in protecting the rights of all confined individuals to fundamental procedural safeguards, we have never suggested that the procedures leading to the commitment of various classes of people for treatment must be identical in all respects. (See, e.g., *In re Gary W.* (1971) 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201].) In light of the automatic termination of LPS conservatorships after one year, and the requirement of a new evidentiary hearing to reestablish the conservatorship at that time, the statutory limits on interim relitigation of the commitment determination are clearly reasonably related to the entire LPS commitment scheme.

when it found that Gandolfo was "not gravely disabled to the extent that he need be maintained in a locked institution" and ordered placement in a less restrictive facility. The wisdom of the court's order is borne out by Gandolfo's successful adaptation to life in a smaller, less restrictive facility closer to the homes of his mother and father.[1]

Nevertheless, the majority deprive Gandolfo and other gravely disabled conservatees of their right to habeas corpus release from unnecessarily restrictive mental facilities. In doing so, the practical realities are ignored which favor allowing the superior court of the county in which the petitioner is confined to determine proper placement.

Instead, a 44-year-old guardianship case in which a ward was denied habeas corpus relief is cited as authority for this ruling. (*Browne* v. *Superior Court* (1940) 16 Cal.2d 593 [107 P.2d 1, 13 A.L.R. 276].) In so doing, the majority promote outmoded principles of jurisdiction and venue. The majority also rely on *Browne* for the proposition that habeas corpus relief may not be had where adequate alternative remedies are available. Alternative forms of relief were found to be adequate in *Browne*. However, these alternatives did not suffer from the restrictions on the frequency of use found in our case. (*Browne* v. *Superior Court, supra,* 16 Cal.2d at p. 601.)

Most importantly, the majority fail to address Gandolfo's claim that Lanterman-Petris-Short (LPS) Act conservatees are denied equal protection of the law. Similarly situated persons are permitted unrestricted resort to simple and effective habeas corpus procedures in the superior court of the county in which they are confined. However, LPS conservatees are required to use burdensome and infrequent proceedings in the conservatorship court to challenge the restrictiveness of their confinement. The great writ of habeas corpus should not be so limited.

I.

As a gravely disabled conservatee, Gandolfo is entitled under the LPS Act to "the least restrictive residential placement available and necessary to achieve the purposes of treatment." (Welf. & Inst. Code, § 5358, subd. (c);[2] *Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1, 10-11 [190 Cal.Rptr.

---

[1]In the briefs, Gandolfo asserted that he has "thrived" in his new placement. Appellant has not challenged this assertion.

[2]Except as otherwise noted, all statutory references are to the Welfare and Institutions Code.

84].)[3] Similarly, as a developmentally disabled person, he is entitled to care that will "protect [his] personal liberty" and provide "the least restrictive conditions necessary to achieve the purposes of treatment." (§ 4502, subd. (a); *In re Hop* (1981) 29 Cal.3d 82, 93 [171 Cal.Rptr. 721, 623 P.2d 282]; *In re Borgogna* (1981) 121 Cal.App.3d 937, 940-941 [175 Cal.Rptr. 788].)

The Superior Court of San Joaquin County gave effect to these important rights when it granted habeas corpus relief. The majority mistakenly assume, however, that the court's action "flew directly in the face of the Orange County court's determination as to a proper placement of Gandolfo . . . ." (Maj. opn., *ante,* at p. 896.) In fact, there was no inconsistency between the initial placement determination and the release order three months later. As Judge Dozier of the San Joaquin County court explained, the release order was based on Gandolfo's condition *at the time of the habeas corpus proceeding.*

Nor was Gandolfo's proper placement a matter " 'exclusively within the jurisdiction of the [Orange County] court, and outside the scope of the writ of *habeas corpus.* ' " (Maj. opn., *ante,* at p. 896.) The majority's reliance for this proposition on *Browne* v. *Superior Court, supra,* 16 Cal.2d 593 is misplaced. First, a constitutional amendment adopted after the *Browne* decision provides the superior courts with statewide jurisdiction. (See maj. opn., *ante,* at p. 900.) Second, in virtually every area touching the mentally and developmentally disabled, comprehensive new statutory schemes have been enacted since the time of *Browne.* These statutes govern involuntary commitment to state hospitals and other mental health facilities. (See Lanterman Developmental Disabilities Services Act, § 4500 et seq.; LPS Act, § 5000 et seq.; see also Prob. Code, § 1400 et seq.) These statutes also provide expressly that challenges to the restrictiveness of a placement may be made by petition for writ of habeas corpus in the superior court of the county in which the hospital is located. (§§ 4801, 7250.)

Such challenges are proper even if the commitment was authorized by the superior court of another county and even if the committing court retains

---

[3]The majority characterize the least restrictive placement requirement as "an important legislative policy." (Maj. opn., *ante,* at p. 898.) While that description is accurate (see § 5358, as amended by Stats. 1980, ch. 681, § 2, p. 2066, quoted in maj. opn., *ante,* at fn. 8), it does not tell the whole story. Numerous courts have found that the right to the least restrictive conditions of institutional treatment is constitutionally mandated by the due process clause of the federal Constitution. (See *Foy* v. *Greenblott, supra,* 141 Cal.App.3d at p. 10, fn. 2 and cases there cited; Hoffman & Foust, *Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses* (1977) 14 San Diego L.Rev. 1100, 1102-1103, fn. 2; Burgdorf & Burgdorf, *A History of Unequal Treatment: The Qualifications of Handicapped Persons as a "Suspect Class" under the Equal Protection Clause* (1975) 15 Santa Clara Law. 855, 893.)

jurisdiction. For example, a dangerous mentally retarded adult committed to a state hospital may obtain habeas corpus relief in the county of confinement. (§ 4801.)[4] That court may order placement in a less restrictive facility. (*Ibid.*) However, the committing court retains jurisdiction. A decision by the Department of Developmental Services to change the same placement is subject to the committing court's approval. (See § 6509.)[5] Thus, the Legislature has seen fit to provide for habeas corpus jurisdiction in the court of the county of confinement despite the continuing jurisdiction of the committing court.[6]

The *Browne* court held that the right to a hearing in the committing court was an adequate alternative to habeas corpus relief. (See 16 Cal.2d at p. 601.) The majority conclude that the present case is indistinguishable from *Browne*. That conclusion is questionable. There was no restriction on the frequency with which the ward in *Browne* could exercise the right to a hearing in the committing court. (See former Prob. Code, § 1470, enacted by Stats. 1931, ch. 281, § 1470, p. 673, repealed by Stats. 1979, ch. 726, § 1, p. 2334.)[7] Here, by contrast, the rights of an LPS conservatee to a

---

[4]Section 4801 provides in relevant part: "Judicial review shall be in the superior court for the county in which the state hospital . . . is located. . . .

" . . . . . . . . . . . . . . . . . .

"The court may order the release of an adult who is committed pursuant to Section 6500 based on a finding of mental retardation and danger to self or others if the court finds that there is no longer a basis for finding the adult a danger to self or others or the court may order the placement of the adult into a less restrictive more appropriate alternative placement but shall continue the order of commitment."

[5]Section 6509 provides in relevant part: "If the Department of Developmental Services decides that a change in placement is necessary, it shall notify in writing *the court of commitment* . . . of such decision at least 15 days in advance of the proposed change in placement. The court may hold a hearing and (1) approve or disapprove of the change, or (2) take no action in which case the change shall be deemed approved." (Italics added.)

[6]A similar conclusion obtains as to section 7250. That section provides implicitly for venue in the county of confinement: "All documents requested by the court in the county of confinement shall be forwarded from the county of commitment to such court. Upon the return of the writ, the truth of the allegations under which [the patient] was committed shall be inquired into and determined."

The majority's reliance on *Griggs* v. *Superior Court* (1976) 16 Cal.3d 341 [128 Cal.Rptr. 223, 546 P.2d 727] is misplaced. *Griggs* requires the transfer of a petition for writ of habeas corpus challenging a particular judgment or sentence to the court which rendered the judgment. (*Id.*, at p. 347.) However, a challenge to the conditions of confinement must be heard in the county of confinement. (*Ibid.*) Gandolfo's petition falls into the latter category. Furthermore, the habeas corpus applications in *Griggs,* unlike Gandolfo's, were not made pursuant to statutory provisions which expressly provide for venue in the county of confinement.

[7]In 1940, the year of the *Browne* decision, former Probate Code section 1470 provided: "Any person who has been declared insane, or for whom a guardian has been appointed as an insane or incompetent person, or the guardian, or any relative or friend, may apply, by petition, to the superior court of the county in which such person was declared insane, or from which letters of guardianship were issued, to have the fact of his restoration to capacity judicially determined. The petition must be verified, and must state that such person is then sane or competent."

hearing in the conservatorship court under sections 5358.3 and 5364 may be exercised only once every six months.

There is an additional factor weighing in favor of jurisdiction and venue in the San Joaquin County court. The Orange County court adjudged Gandolfo to be both developmentally disabled and gravely disabled.[8] While most lay people have considerable difficulty in understanding and exercising their rights to petition the courts for relief, even the simplest of procedures may present an insurmountable challenge to a person with Gandolfo's mental disabilities. (See *Doe* v. *Gallinot* (9th Cir. 1981) 657 F.2d 1017, 1023.)

Under sections 4800 and 4801, a developmentally disabled adult may initiate habeas corpus proceedings by making a simple request for release to a hospital staff member. Even a nonverbal indication of desire to leave is treated as a request for release under the Release Procedures Manual used by state hospital personnel in such cases. (See *In re Hop, supra,* 29 Cal.3d at p. 88.)

By contrast, in order to obtain a rehearing as to a conservatee's status or rights—including the right to placement in a less restrictive setting—an LPS conservatee must file a petition in the superior court which established the conservatorship. (See §§ 5358.3, 5364.) As in this case, that court and the conservatee's appointed counsel may be hundreds of miles away. Unlike the habeas corpus mechanism provided by sections 4800 and 4801, neither process may be triggered by a simple request for release made to a readily accessible hospital staff member who is charged with a statutory duty to act upon that request.

It is unreasonable to place such a burden upon an individual who has been found to be unable to provide for his or her own basic personal needs. As this court has observed in an analogous context, "[I]t must be kept in mind . . . that we are dealing with persons who have been committed to state hospitals for mental disorders rendering them incompetent to participate in their own defense. It seems clearly inappropriate to place upon such persons the burden of initiating proceedings to secure their freedom." (*In re Davis* (1973) 8 Cal.3d 798, 806-807, fn. 6 [106 Cal.Rptr. 178, 505 P.2d 1018].)

Gandolfo claims that he is entitled to habeas corpus relief in San Joaquin County under two provisions of the Welfare and Institutions Code. First, he claims a right to relief pursuant to section 4800. Under section 4800, "[e]very adult who is or has been admitted or committed to a state hospital . . . as a developmentally disabled patient [has] a right to a hearing by writ

---

[8]Gandolfo has an I.Q. of 45.

of habeas corpus for his release from the hospital . . . after he or any person acting on his behalf makes a request for release to any member of the staff of the state hospital . . . ." Upon such a request, the hospital staff member and medical director must promptly complete a "request for release" form and notify the patient's parent or conservator and the superior court for the county in which the state hospital is located. (§ 4800.) The superior court is then required to notify the patient of his or her right to counsel. (§ 4801.) If necessary, the court must appoint counsel to assist in the preparation of a petition for writ of habeas corpus and to represent the patient in the proceedings. (*Ibid.*)

This court has held that habeas corpus is the appropriate means for a developmentally disabled adult to challenge his or her confinement in a state hospital. (*In re Hop, supra,* 29 Cal.3d at p. 86 [construing § 4800 and Pen. Code, § 1474].) Appellant Heim does not question this rule, but contends that sections 4800 and 4801 are inapplicable here since Gandolfo was not committed to Stockton State Hospital *as* developmentally disabled, but rather as gravely disabled.

That contention is without merit. The Orange County court found that Gandolfo was *both* developmentally disabled *and* gravely disabled. The court ordered that Gandolfo be placed in Stockton State Hospital, a facility which the Legislature has designated for the treatment of developmentally disabled persons (§§ 4416, 4440) but not for the treatment of gravely disabled persons (see § 7200).[9] Further, sections 4800 and 4801 provide for notice to and participation by a conservator in habeas corpus proceedings. The fact that these provisions were added in 1977, 10 years after the enactment of the LPS conservatorship scheme (§ 5350 et seq.) indicates that they were intended to refer not only to probate conservators (see Prob. Code, § 1800 et seq.) but also to LPS conservators. (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].)

Gandolfo also claims a right to habeas corpus relief under section 7250.[10] That section provides that any person who has been "committed" to a state

---

[9]Metropolitan State Hospital and Atascadero State Hospital are the only facilities designated for the care, treatment, and education of the "mentally disordered," a category which includes the gravely disabled. (See *ibid.*; § 5008, subd. (h).)

[10]Section 7250 states: "Any person who has been committed is entitled to a writ of habeas corpus, upon a proper application made by the State Department of Mental Health or the State Department of Developmental Services, by such person, or by a relative or friend in his behalf to the judge of the superior court of the county in which the hospital is located. All documents requested by the court in the county of confinement shall be forwarded from the county of commitment to such court. Upon the return of the writ, the truth of the allegations under which he was committed shall be inquired into and determined. The medical history of the person as it appears in the clinical records shall be given in evidence, and the superintendent in charge of the state hospital wherein the person is held in custody and any other person who has knowledge of the facts shall be sworn and shall testify relative to the mental condition of the person."

hospital is entitled to a writ of habeas corpus upon proper application to the superior court of the county in which the hospital is located. Heim argues that section 7250 does not apply since Gandolfo was not "committed" within the meaning of the statute. Instead, Heim argues that Gandolfo was a voluntary patient.

This argument strains credulity. "Although the LPS conservatee is, by statute, a voluntary patient, other California statutes acknowledge that he is, in reality, an involuntary patient, detained in the mental treatment facility because of a decision by his conservator. . . . [I]n 1976 the California Legislature enacted statutes declaring that involuntary civil mental health treatment for incompetent wards and probate conservatees may be obtained only through [the] LPS [Act]. The statutes enumerated the specific provisions of [the] LPS [Act] that were applicable to involuntary hospitalization and included the LPS conservatorship provisions within the prescribed list." (Morris, *Conservatorship for the "Gravely Disabled": California's Nondeclaration of Nonindependence* (1978) 15 San Diego L.Rev. 201, 219, citing Stats. 1976, ch. 1357, §§ 14 & 29, which amended Prob. Code, §§ 1500 & 1754; see also § 5326.7 [placing restrictions on the administration of convulsive treatment to "an involuntary patient, including anyone under . . . conservatorship . . . ."].) Further, this court has recognized that one power which may be granted to a conservator under the provisions of the LPS Act is "the power to *involuntarily commit* a conservatee to a state mental institution . . . ." (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 221 [152 Cal.Rptr. 425, 590 P.2d 1], italics added.)

Accordingly, a developmentally and gravely disabled LPS conservatee confined in a state hospital is entitled under sections 4800, 4801 and 7250 to pursue a writ of habeas corpus in the superior court for the county in which the conservatee is confined. The majority's failure to address, much less follow, these legislative mandates is most unfortunate.

## II.

Even if we were to assume for the sake of argument that neither statutory provision applies, Gandolfo's right to habeas corpus relief in the county of confinement is compelled by the constitutional guarantee of equal protection of the law.

This court has characterized the right to personal liberty as a "fundamental interest." (*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) Habeas corpus has been denominated "the Great Writ." (*Caroo* v. *United States* (1961) 364 U.S. 611, 615 [5 L.Ed.2d 329, 333, 81 S.Ct. 338].) It is undisputed that Gandolfo's fundamental liberty interest

is at stake in his challenge to the restrictiveness of his confinement in a locked state hospital unit.

"[I]n reviewing statutorily created classification schemes which affect fundamental interests the burden rests upon the state to establish that 'it has a "compelling interest" which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest.'" (*In re Hop, supra,* 29 Cal.3d at p. 89.) Adults facing involuntary hospitalization as LPS conservatees (§ 5358) and as developmentally disabled persons (§ 4825) are "similarly situated" for purposes of equal protection analysis. (*In re Hop, supra,* 29 Cal.3d at pp. 87, 92-94.) Each group is constitutionally entitled to "the same congeries of [procedural] rights" possessed by the other. (See *id.,* at pp. 93-94.) Developmentally disabled persons hospitalized at the request of conservators have a right to habeas corpus relief pursuant to sections 4800 and 4801.

Accordingly, the state must demonstrate a compelling state interest which justifies denying LPS conservatees that same right. (See *In re Hop, supra,* 29 Cal.3d at p. 89; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171, fn. 8 [167 Cal.Rptr. 854, 616 P.2d 836]; *In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097].) It must also show that the distinctions drawn between the remedies afforded LPS conservatees and other persons civilly committed to state hospitals are necessary to further that interest. (See *People* v. *Olivas, supra,* 17 Cal.3d at p. 251; *In re Moye, supra,* 22 Cal.3d at p. 465.)

The state has not met its burden. Both the conservator and the majority assert that the state has an interest in preserving the jurisdiction of the Orange County Superior Court over Gandolfo's conservatorship. However, the San Joaquin Superior Court did not interfere with that interest when it found, three months later, that Gandolfo was ready for life in a setting less restrictive than a locked state hospital ward.

Nor is there any justification for restricting LPS conservatees to two hearings per year in a court that may be hundreds of miles from the hospital in which they are confined. That limited remedy is obviously not at all comparable to the unrestricted right to pursue habeas corpus which is accorded developmentally disabled probate conservatees (§§ 4800, 4801; Prob. Code, § 1800 et seq.) and dangerous mentally retarded persons (§§ 4800, 4801, 6500). If anything, a person suffering from a grave disability due to a mental disorder is more likely to experience rapid improvement under treatment than a person with a developmental disability which by definition is "expected to continue, indefinitely . . . ." (Prob. Code, § 1420.) Thus,

the need for ready access to a nearby court to establish eligibility for a less restrictive placement is paramount.

### III.

Both the Legislature and the Constitution require that an LPS conservatee be given unrestricted access to habeas corpus relief in the county of confinement. The majority would limit that right contrary to the Legislature's intent and the people's will as enunciated in the Constitution. I cannot agree. The trial court's order should be affirmed.